JOHN D. WILLIAMS AND SUZANNE M. WILLIAMS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Williams v. Commissioner
Docket No. 25804-85.
United States Tax Court
T.C. Memo 1987-308; 1987 Tax Ct. Memo LEXIS 308; 53 T.C.M. (CCH) 1203; T.C.M. (RIA) 87308; June 23, 1987. John N. Moore, for the petitioners. Susan M. Gray, for the respondent. PATE
MEMORANDUM FINDINGS OF FACT AND OPINION PATE, Special Trial Judge: This case was heard pursuant to the provisions of section 7456(d) of the Code (redesignated as sec. 7443A(b) by the Tax Reform Act of 1986, Pub. L. 99-514, section 1556, 100 Stat. 2755) and Rules 180, 181 and 182. [1]
Respondent determined the following deficiencies in petitioners' Federal income taxes: Year
Deficiency
1978
$1,187.25
1979
834.75
1980
2,103.00
1981
3,816.60
After concessions, we must decide: (1) whether petitioners may deduct a loss realized on their horse farm; (2) whether *314 investment credits previously claimed on horse farm property must be recaptured in 1981; (3) whether petitioners may deduct a loss realized on their aircraft leasing activities; (4) the correct amount of the ACRS deduction attributable to assets used in petitioners' muffler shop and auto repair business; and (5) whether petitioners are entitled to deduct expenses relating to an office in their home. [2] Some of the facts have been stipulated and are so found. John D. Williams (hereinafter "John") and Suzanne M. Williams (hereinafter "Suzanne") are husband and wife and filed joint income tax returns for the years in issue. Petitioners have resided at the same address in Burton, Ohio at all times relevant to this case. During 1981, John was employed as a senior project engineer and Suzanne was employed as a bookkeeper. *315 Both petitioners held similar positions during 1978, 1979, 1980, 1982 and 1983. Since the issues for our decision involve three disparate activities, we have combined the findings of fact and opinion relating to each such activity. ISSUES NO. 1 and 2 - HORSE FARM Petitioners owned a piece of land in Burton, Ohio on which their residence was located. In 1976, John built a two-story barn, consisting of four horse stalls and a storage area for feed and hay, on the land contiguous thereto. In 1979, petitioners began boarding horses for outsiders. In this regard, petitioners deducted the following farm losses: Tax
Gross
Year
Income
Expenses
Losses
1979
$1,200
$2,760
$1,560
1980
360
3,247
2,887
1981
360
4,392
4,032
1982
430
5,155
4,675
1983
450
6,807
6,357
In addition, on their 1979 income tax return, petitioners claimed an investment credit on certain farm property. Respondent disallowed petitioners' 1981 loss on the grounds that the horse farm was not an activity engaged in for profit and, alternatively, that the deductions attributable thereto had not been substantiated. Respondent also determined that the investment credit *316 claimed on the farm property must be recaptured in 1981. Suzanne was the petitioner primarily responsible for the horse farm operations. She had been raised on a farm and wanted her children to have experience with horses. She kept only the most rudimentary of business records: receipts, cancelled checks and lists of income and mileage to purchase hay. However, she did consult with John regarding the financial aspects of the operations, and, in this regard, John estimated potential gross receipts from operations of $4,000 per year with estimated expenses of $2,000 per year. At trial, John could not explain on what basis he had computed these projections. In fact, Suzanne charged only $60 per month for board when services (such as feeding and cleaning the stall) were included, and only $30 per month if the horse's owner performed these duties. We note that, at these rates, the maximum annual income possible was $2,880 ($60 X 4 stalls for 12 months). Therefore, even with all four stalls occupied and Suzanne rendering services to all owners, expenses would exceed gross income. [3] Further, although Suzanne's rates were below those prevailing in the area, she boarded only one or *317 two horses at any time from 1979 to 1981. Realizing that their potential boarding income was limited, petitioners acquired additional land in 1979 to expand their facilities. Despite this acquisition, Suzanne neither expanded the facilities or services nor raised prices in subsequent years. Further, she did nothing to cut costs. Loss
Sections 183(a) and (b) provide that expenses attributable to an activity "not engaged in for profit" are deductible only to the extent that gross income is derived from the activity. Therefore, petitioners' 1981 loss is allowable if, and only if, their horse farm is an activity engaged in for profit. Whether an activity is engaged in for profit turns on whether the taxpayer has an actual and honest objective of making a profit. Sec. 1.183-2(a), Income Tax Regs.; Surloff v. Commissioner,81 T.C. 210, 233 (1983); Dreicer v. Commissioner,78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). *318 The taxpayers' expectation of profit need not be a reasonable one, but there must be a good-faith objective of making a profit. Sec. 1.183-2(a), Income Tax Regs.; Golanty v. Commissioner,72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); Allen v. Commissioner,72 T.C. 28, 33 (1979). Although profit need not be the sole purpose for undertaking or continuing an activity, it must be the primary purpose. Sec. 1.183-2(b)(9), Income Tax Regs.; Lemmen v. Commissioner,77 T.C. 1326, 1340 (1981). See Commissioner v. Groetzinger,    U.S.    (1987). The determination of whether the requisite profit objective exists is to be resolved on the basis of all the surrounding facts and circumstances. Sec. 1.183-2(a), Income Tax Regs.; Dunn v. Commissioner,70 T.C. 715, 720 (1978), affd. on another issue 615 F.2d 578 (2d Cir. 1980). Mere statements of intent are not determinative. Engdahl v. Commissioner,72 T.C. 659, 666 (1979). Petitioners bear the burden of proving that their primary purpose was to make a profit. Welch v. Helvering,290 U.S. 111 (1933); *319 Rule 142(a). The regulations set out nine relevant factors to be considered among others in determining whether an activity is engaged in for profit. Briefly, these factors include: (1) the manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity [4]; (7) the amount of occasional profit, if any, which is earned; (8) the financial status of the taxpayer; and (9) whether the elements of personal pleasure or recreation are involved. Sec. 1.183-2(b), Income Tax Regs. No one factor is controlling in making this determination. Sec. 1.183-2(b), Income Tax Regs.; Golanty v. Commissioner,72 T.C. at 426. *320 In making our determination, we immediately are struck by the fact that petitioners' horse farm had none of the "trappings of a business." See Bessenyey v. Commissioner,45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967). When John originally built the barn in 1976, it was strictly for personal use. When petitioners began boarding horses in 1979 they did not take any steps to acquire the expertise necessary to carry on this activity as a business. Although Suzanne grew up on a farm, there is no indication that she knew how to run a horse farm, nor is there any evidence that she made any effort to obtain such expertise either from experts, seminars or publications. In fact, both John and Suzanne had outside employment and devoted little time to the farm. Further, John made only a rough guess at the potential income and expenses, without adequately exploring the grounds for such estimates, and Suzanne kept minimal records of the income and expenses of the farm operations. Had proper records been kept, they would have realized that the venture could not be profitable based on the established price structure and mode of operations. See Golanty v. Commissioner,72 T.C. at 430. *321 Petitioners have also failed to show that any advertising or other promotional activity took place to increase the number of horses boarded. Moreover, although petitioners realized that they needed to expand their facilities as early as 1979 and purchased additional land to do so, they subsequently did nothing to enlarge their barn, expand their services, raise their prices, or reduce costs. See Burger v. Commissioner,809 F.2d 355, 360-361 (7th Cir. 1987), affg. T.C. Memo. 1985-523. Therefore, it is not surprising that from 1979 until 1983, petitioners sustained steadily increasing losses. These losses did not result from nonrecurring start-up costs or unforeseen or fortuitous circumstances beyond petitioners' control. Cf. Engdahl v. Commissioner,supra at 669. Rather, they resulted from a failure to conduct the horse farm with an objective for profit. Bessenyey v. Commissioner,45 T.C. at 275. Consequently, we conclude that petitioners' horse farm operations were not entered into with a primary objective of profit, and, accordingly, sustain respondent's disallowance of petitioners' 1981 horse farm loss. *322 [5]
Investment Credit Recapture
Respondent maintains that the investment credit claimed in 1979 with respect to the farm property should be recaptured in 1981 because petitioners did not use such property in an activity engaged in for profit in that year. Section 47(a) provides that an investment credit shall be recaptured when section 38 property [6] "is disposed of, or otherwise ceases to be section 38 property" in the taxpayer's hands, if such disposition or cessation occurs prior to the close of the useful life which was taken into account in initially calculating the investment credit. See sec. 1.47-1(a)(1), Income Tax Regs. In 1979, property had to be held for a minimum of three years to be entitled to any investment credit. See sec. 46(c). *323 The linchpin for investment credit recapture is whether the section 38 property was disposed of or otherwise ceased to be section 38 property during the year. Sec. 47(a)(1). Transactions considered dispositions or cessations include: sales; exchanges; transfers; distributions; gifts; certain leases; shifts from business to personal use; shift to predominant use outside the United States; and sales of partnership interests, shares of Subchapter S stock or interests in a trust or estate. S. Rept. No. 1881, 87th Cong., 2d Sess. 148-149 (1962), 1962-3 C.B. 707, 852-853; sec. 1.47-1, Income Tax Regs. This nonexclusive list dictates that, in order to hold that property was "disposed of, or otherwise ceased to be section 38 property," we must find that, in the year of recapture, a change occurred either in the ownership or use of the property. See sec. 1.47-2(a)(2), Income Tax Regs. Where we cannot find the requisite change, an investment credit may not be recaptured, even where a taxpayer was not entitled to the credit in the year claimed. [7]
*324 In the instant case, we cannot find that the requisite change took place in 1981. It is uncontested that petitioners did not transfer or otherwise dispose of ownership of the farm property during that year. Moreover, petitioners used the farm property consistently throughout the 1979-1981 period; there was no evidence that the property was ever used in any activity engaged in for profit. [8] Therefore, there was no change in usage during 1981. While petitioners may not have been entitled to an investment credit when claimed in 1979, that issue is not before us. [9] We only determine that the requisite change in ownership or use did not occur in 1981, and, accordingly, hold that petitioners' investment credit may not be recaptured in 1981. [10]
*325 ISSUE NO. 3 - J D AIRCRAFT John has owned several airplanes and had engaged in several activities involving airplanes prior to 1981. He has held a pilot's license since he was 18 years old, which, in 1981, included both an instrument and multiple engine rating. During 1981, John was acquainted with David Lindsey (hereinafter "Lindsey"), the owner and operator of a thriving airplane charter service at nearby Geauga County Airport. In his operations, Lindsey would first contract charters and then rent airplanes and hire pilots to fulfill his obligations under these contracts. He wanted to add a cargo plane to his fleet of available aircraft and for this reason persuaded John and one Richard Bonner (hereinafter "Bonner"), to purchase a Cessna 185 (hereinafter "the Cessna") to rent for charter flights. They purchased the Cessna for $16,000 in August 1981. John and Bonner called their venture "J D Aircraft." The Cessna was a single engine, high wing, utility type airplane, which, because of its high weight carrying capacity was best suited as a cargo plane. Nevertheless, it was capable of seating six passengers on removable bench-type seats. Compared to an airplane designed *326 to carry people, however, the Cessna was noisy, consumed a lot of fuel and was difficult to fly. When purchased, the Cessna needed repairs and radio certification and therefore was not available for commercial operation until December of 1981. Lindsey then began promoting charters for it. Unfortunately, in April 1982, Lindsey and most of his pilots were killed in a calamitous airplane crash. Following Lindsey's death, all charter business at the airport fell off dramatically, resulting in minimal usage of the Cessna. Petitioners deducted their share of the losses attributable to J D Aircraft for 1981, 1982 and 1983 as follows. Year
Gross Income
Expenses
Losses
1981
$100
$2,436
$2,336
1982
350 3,549
3,199
1983
600 4,907
4,307
In the notice of deficiency, respondent disallowed the loss for 1981 on the grounds that the activities of J D Aircraft were not engaged in for profit. [11]
In determining whether J D Aircraft engaged in airplane leasing with an objective of profit we have applied the same *327 criteria we used in evaluating the horse farm. See supra. After due consideration of the facts and for the following reasons, we find that J D Aircraft engaged in its activities with a profit objective and hold that petitioners may deduct the 1981 loss sustained from its activities. Essentially, J D Aircraft was an enterprise organized and carried on as a financing tool for Lindsey's charter operations. In entering into this transaction, John and Bonner relied on Lindsey's advice, expertise, reputation, and following. Initially, we note that Lindsey's position as the proprietor of a thriving charter business enabled him to assess the potential demand and profitability of this type of cargo plane, and we are convinced that he persuaded John and Bonner that their investment in the Cessna would pay off. Moreover, J D Aircraft's rental operations were primarily, if not exclusively, dependent upon Lindsey. J D Aircraft relied on Lindsey to contact prospective lessors, set up the charters, and arrange for pilots to fly the Cessna. J D Aircraft justifiably relied on Lindsey in light of his established business and previous association with John in a similar arrangement. Reliance *328 on competent and qualified persons to carry on an activity supports a profit objective. Sec. 1.183-2(b)(3), Income Tax Regs.
Respondent argues that the losses J D Aircraft sustained in 1981 as well as 1982 and 1983 indicate a lack of profit objective. We disagree. In the initial year of operation, 1981, the Cessna was not available for service until December and, therefore, not surprisingly, the Cessna was rented for only a few hours of flying time. In the meantime, J D Aircraft incurred all of the fixed expenses incident to owning an aircraft. [12] The resulting loss which could be expected to occur during the initial phase of an activity does not indicate a lack of profit objective. See sec. 1.183-2(b)(6), Income Tax Regs.; Engdahl v. Commissioner,72 T.C. 659, 669 (1979). The losses during 1982 and 1983 were caused by the premature *329 and unexpected deaths of Lindsey and his pilots just a few months after the Cessna became available for use. See sec. 1.183-2(b)(6), Income Tax Regs. Since J D Aircraft was not in and of itself an operating entity, but was formed to provide equipment to be used in Lindsey's charter service, for all practical purposes, his death doomed the enterprise. The demise of virtually all charter activity at the airport confirms the important role Lindsey and his pilots played. Since J D Aircraft had no way of anticipating this unfortunate turn of events, the losses resulting therefrom should not be used to discount petitioner's profit objective in 1981. In addition, under these circumstances, we do not find J D Aircraft's failure to maintain extensive books and records significant. An important purpose of maintaining books and records is to determine what operations are unprofitable and how they can be changed so as to ultimately realize a profit. See Golanty v. Commissioner,72 T.C. at 430. Since J D Aircraft's activities never really got off the ground, [13] and most of the expenses it incurred were fixed costs related to owning an airplane, the analysis which an extensive *330 set of books and records might otherwise have provided would not have been of much assistance. Finally, respondent argues that John purchased the Cessna for personal use. The evidence clearly shows that the Cessna was noisy, fuel inefficient, difficult to fly, and best suited for cargo not people. In addition, John owned another aircraft which was better suited for personal flying and, concededly, was used for John's personal use during the year. Therefore, we are convinced that John did not purchase the Cessna for personal pleasure. See sec. 1.183-2(b)(9), Income Tax Regs.; Allen v. Commissioner,72 T.C. at 36. ISSUE NO. 4 - NORTH MADISON MUFFLER SHOP
In 1981, John and David Pleva started a muffler installation and automobile repair business called North Madison Major Muffler Shop (hereinafter "North Madison"). They agreed to split profits and losses resulting therefrom on a 50/50 basis. With regard to North Madison's operations, the only issue remaining for our determination is the amount of the accelerated cost recovery system (hereinafter "ACRS") deduction to which petitioners are entitled in 1981, and the only factor we *331 need decide for that deduction to be computed is the number of months during 1981 for which recovery is allowable. Petitioner contends that the ACRS deduction should be computed using July 1, 1981 as the starting date, while respondent maintains that October 1, 1981 is the correct date. In order to establish its operations, North Madison agreed to purchase an old abandoned service station in June 1981. [14] Because the building was in a run down condition and required extensive refurbishing, the seller allowed North Madison to take possession soon after the purchase agreement was signed. However, title was not transferred until late August or early September because of problems with the deed. The needed repairs were completed sometime after that. On June 27, 1981, North Madison entered into an agreement with Major Muffler Centers, Inc., which provided for the purchase of a Major-Matic Deluxe Pipe Bending Machine, and allowed North Madison to advertise as an "Authorized Major Muffler Dealer." The pipebending machine was designed to customize pipe for the exhaust systems North Madison installed. The machine was delivered in *332 late September 1981 and, following training in its use, North Madison began using it in October 1981. Moreover, although North Madison occasionally installed mufflers using preformed pipe and performed some automotive repairs prior to receiving the pipebending machine, North Madison did not hold its official grand opening until October 1981, after which it began to regularly service customers and sell products. The company checking account was also opened at this time. On their 1981 tax return, petitioners claimed a full year of ACRS deductions for both the equipment and building. [15] However, on the depreciation schedule, they stated that the property listed thereon had been acquired in October 1981. In the notice of deficiency, respondent disallowed that portion allocable to months prior to October 1981. Under section 168 a taxpayer is entitled to an annual deduction to "recover" a portion of the unadjusted basis of property used in his trade or business. *333 The deduction is based on percentages depending on the class of recovery property. Sec. 168(b). For this purpose, the parties have agreed that the building is "15-year real property" (sec. 168(c)(2)(D)) and the equipment is "5-year property" (sec. 168(c)(2)(B)). For the year 15-year real property is placed in service, the allowable recovery percentage varies depending upon the number of months the property was actually in service. Sec. 168(b)(2)(A). Respondent maintains that North Madison did not place its assets in service before October 1981. Petitioners argue that North Madison started business in July 1981 and that date should be used to measure their ACRS deduction. Petitioners have the burden of proof on this issue. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). After carefully considering all the evidence, we find that petitioners have not met their burden of proving that North Madison placed the building in service prior to October 1981. As a general rule, an asset subject to depreciation is considered placed in service when it is acquired and put into use in a trade or business. See Cooper v. Commissioner,542 F.2d 599 (2d Cir. 1976), *334 affg. a Memorandum Opinion of this Court; Madison Newspapers, Inc. v. Commissioner,47 T.C. 630, 633 (1967). The "placed in service" requirement is met when an asset is in a state of readiness and available for a specifically assigned function in an operating trade or business. Piggly Wiggly Southern, Inc. v. Commissioner,84 T.C. 739, 745-746 (1985), affd. on another issue 803 F.2d 1572 (11th Cir. 1986). North Madison agreed to purchase the building in June of 1981, but the building required extensive refurbishing before it could be fully utilized in the business. The record is unclear as to exactly when these improvements to the building were completed. However, we do know that they took approximately two and a half months to complete and that the building was refurbished by the time North Madison held its grand opening in October 1981. Although North Madison did some auto repair work while the improvements were in process, there is no record of how much of the refurbishing was done or what portion was completed at any particular time. Consequently, we can only find that the entire building was placed in service at the time the *335 refurbishing was completed. [16] Accordingly we sustain respondent's determination as to the depreciation allowable on the 15 year real property. However, the rules differ in the case of property other than 15-year *336 real property. The percentages for computing the ACRS deduction on 5 year recovery property are set out in section 168(b)(1) and the percentage for the year of acquisition is 15 percent. This percentage is applicable regardless of what month during the year the property is acquired or placed in service. See Staff of the Joint Committee on Taxation, General Explanation of the Economic Recovery Act of 1981, p. 79 (Comm. Print 1981). However, when such property is acquired by an entity with a short taxable year, [17] the recovery deduction must be further multiplied by a fraction, the numerator of which is the number of months in the short taxable year and the denominator of which is 12. Sec. 168(f)(5). [18] Therefore, we must decide whether North Madison had a short taxable year in 1981 and, if so, on what date that year began. In making our decision, we must first determine the entity in which *337 North Madison operated. Although petitioners reported all of the income and deductions relating to North Madison on a Schedule C, in fact, John joined with David Pleva to own and operate this enterprise. Both executed the franchise agreement and they agreed to split profits and losses on a 50/50 basis. [19] Both John and David Pleva rendered services to North Madison. The Supreme Court has stated that the existence of a partnership depends upon "whether, considering all the facts * * *, the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise." Commissioner v. Culbertson,337 U.S. 733, 742 (1949) (Fn. ref. omitted.); see also Commissioner v. Tower,327 U.S. 280 (1946); Torres v. Commissioner,88 T.C. 702, 737 (1987); Sparks v. Commissioner,87 T.C. 1279 (1986). *338 Moreover, in McDougal v. Commissioner,62 T.C. 720, 725 (1974), we found that a [partnership] is deemed to arise when two or more persons agree, expressly or impliedly, to enter actively upon a specific business enterprise, the purpose of which is the pursuit of profit; the ownership of whose productive assets and of the profits generated by them is shared; the parties to which all bear the burden of loss, and the management of which is not confined to a single participant * * * [20]
Therefore, although a 1981 partnership return of income was not filed for North Madison, it is clear from the above facts that John and David Pleva's arrangement contained all of the enumerated elements. Consequently, we find that, for tax purposes, North Madison was operated as a partnership and John reported his proportionate share of such income and deductions as a member of such partnership. See secs. 761(a) and 7701(a)(2).
Having found that North Madison operated as a partnership, we must determine its *339 taxable year for 1981. A taxpayer's taxable year is determined by the period for which it must file a return. Secs. 441(b); 7701(a)(23). See also Estate of Roodner v. Commissioner,64 T.C. 680, 682 (1975). A taxpayer who is in existence during only a part of a year is required to file a return for that short period. Sec. 443(a)(2); sec. 1.443-1(a)(2), Income Tax Regs. For this purpose, a partnership is treated as a taxpayer. Sec. 706(b)(1). Further, a partnership becomes a taxpayer when it is organized and realizes any income or deductions. See sec. 1.443-1(a)(2), Income Tax Regs. See also secs. 706(b)(1); 761(a) and 6031(a). Therefore, a partnership must file a return beginning at the time when it first receives any income or incurs any deductions. Sec. 6031; sec. 1.6031-1(a), Income Tax Regs. Ordinarily, a partnership composed of individuals must end its taxable year on December 31st. See sec. 706(b); sec. 1.706-1(b)(1)(ii), Income Tax Regs. Therefore, unless activated on January 1st, partnerships are usually required to file a return for a short taxable year for the first taxable year. Sec. 441(b)(3); 7701(a)(23). Since North Madison correctly *340 ended its first taxable year on December 31st, we need only determine the beginning of such year in order to determine the number of months in its short taxable year. As stated earlier, a partnership is required to file a return when two events have occurred: first the partnership must have been formed; and secondly, it must have realized some income or incurred some deduction. John and David Pleva agreed to purchase a building and also agreed to purchase a pipebending machine in June 1981 for the purpose of operating a muffler shop. Consequently, for tax purposes, a partnership arose no later than the time the first of these events occurred. Further, North Madison began refurbishing the building and repairing a few automobiles in July 1981. Therefore, it realized some income and incurred some deductions starting in July 1981. Based on these findings, we agree with petitioner that North Madison began its short taxable year on July 1, 1981. Accordingly, the 6-month period in North Madison's short taxable year entitles it to one-half of the annual ACRS deduction on its 5 year property for 1981, 50 percent of which passes through to John. [21]
*341 ISSUE NO. 5 - HOME OFFICE DEDUCTION Suzanne used a den in petitioners' home to maintain the books and records for North Madison because the muffler shop did not have an office on its premises. The den also contained some of J D Aircraft's records, petitioners' car titles and personal income tax forms. It did not contain a telephone. Petitioners claimed deductions for insurance, utilities and depreciation relating to the den on their 1981 income tax return. Respondent disallowed these deductions in their entirety. Generally, no deduction is allowed for an office located in the taxpayer's home. [22] Sec. 280A(a). There are, however, a few limited exceptions to this rule. Section 280A(c) allows a deduction for the use of a portion of the dwelling exclusively used on a regular basis either as the taxpayer's principal place of business (section 280A(c)(1)(A)) or as a place of business which is used by patients, clients, or customers in meeting or dealing with the taxpayer in the normal course of his trade or business (section 280A(c)(1)(B)). The second exception clearly does not apply in this case. Therefore, only if we find that a portion of petitioners' residence was "exclusively *342 used" on "a regular basis" as either North Madison's or J D Aircraft's "principal place of business" may the deduction be allowed. Nothing in the legislative history of section 280A furnishes guidance as to the scope of the phrase "principal place of business" in the context of section 280A. Baie v. Commissioner,74 T.C. 105, 109 (1980). Nor are there any final regulations available to assist us. See Scott v. Commissioner,84 T.C. 683, 689-690 (1985). The test laid down by this Court is whether the office is the "focal" point of the taxpayer's particular business activities. Jackson v. Commissioner,76 T.C. 696, 700 (1981); Baie v. Commissioner,supra.See Curphey v. Commissioner,73 T.C. 766, 776 (1980). The "focal" point is not dependent solely on the number of hours of use. Rather, it is that location which is most essential to carrying on the taxpayer's business. *343 Cristo v. Commissioner,T.C. Memo. 1982-514. We find that petitioners' den was not the focal point for either J D Aircraft's or North Madison's business activities. If customers wished to lease the Cessna, they would have contacted Lindsey at the airport to arrange for its charter. Moreover, the Cessna was stored at the airport and its use originated there. If customers wished to have their muffler changed, they would bring their automobile to the muffler shop and the services were performed there. These activities were the most essential to the respective businesses. Therefore, we find that the focal points of J D Aircraft's and North Madison's business activities were the airport and the muffler shop, respectively. Nevertheless, petitioners, citing Curphey v. Commissioner,supra, argue that a taxpayer may have more than one principal place for conducting his business. This Court held in Curphey that for each trade or business a taxpayer conducts he may have a separate principal place for conducting it. However, there can be only one principal place for conducting each trade or business. Since we have already found that petitioners' *344 den does not so qualify for either business, we hold that they are not entitled to any deductions relating to an office in their home. [23]
Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise provided, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, and all rule references are to the Tax Court Rules of Practice and Procedure.↩
2. All of the issues relate to 1981. Respondent's proposed deficiencies for 1978, 1979 and 1980 are attributable to investment credits claimed for 1981 and carried back to those years. Respondent properly proposed deficiencies relating to these carrybacks even though the general 3-year statute of limitations for those years had expired. See secs. 6501(a) and (j).↩
3. Although petitioners' expenses of $2,760 for 1979 were slightly less than their potential maximum gross income, expenses such as feed would have increased had all stalls been occupied.↩
4. At trial, respondent moved to introduce into evidence petitioners' 1982 and 1983 tax returns to show that petitioners' activities were not engaged in for profit. Petitioners objected, arguing that the results of operations in subsequent years are not relevant to a taxpayer's profit objective during the year in issue. We deferred ruling on the motion. Initially, we note that the gross income, total expenses, and losses from both the horse farm and aircraft leasing activities for 1982 and 1983 have been stipulated by the parties, and petitioners have made no objection to the relevancy of that information. Therefore, ruling on petitioners' objection only affects the admissibility of the underlying detail of expenses petitioners claimed on those tax returns. The type of expenses incurred during subsequent years indicates whether the activity's losses are attributable to customary business risks, unforeseen circumstances, or a lack of profit objective, all of which are factors which must be taken into account in determining the taxpayer's profit objectives. See sec. 1.183-2(b)(6), Income Tax Regs. Further, expenses indicating a failure to adopt new techniques or abandon unprofitable methods are evidence of a lack of profit objective. Sec. 1.183-2(b)(1), Income Tax Regs. See Bessenyey v. Commissioner,45 T.C. 261 (1965), affd. 379 F.2d 252↩ (2d Cir. 1967). All of these factors are to be considered in determining whether the taxpayers have an objective of profit. Therefore, we have received petitioners' 1982 and 1983 income tax returns into evidence as the information contained therein is relevant to our determination of these factors.
5. Although respondent also argued that petitioners failed to substantiate their claimed expenses, he only disallowed the excess of petitioners' claimed farm deductions over their reported farm income in the notice of deficiency. Consequently, having found for respondent under sec. 183, we need not consider his alternative argument.↩
6. Section 38 provides a credit for investment in certain tangible depreciable property used in a trade or business or held for the production of income. See secs. 48(a)(1) and 167(a). No investment credit is allowable for property used in an activity not engaged in for profit. See sec. 183(c); Hagler v. Commissioner,86 T.C. 598, 621-622↩ (1986), on appeal (11th Cir., Sept. 15, 1986; 2d Cir., Sept. 26, 1986).
7. Even the respondent's published opinions reach this same conclusion. See G.C.M. 38,855 (May 18, 1982) and G.C.M. 38,869↩ (June 10, 1982).
8. We may look at 1979 and 1980 in making our determination regarding 1981. Sec. 6214(b); Mennuto v. Commissioner,56 T.C. 910, 923 (1971). See W.M. Ritter Co. v. Commissioner,30 B.T.A. 231, 277 (1934), modified on another issue 33 B.T.A. 117 (1935). See also footnote 9, infra.↩
9. Section 6501(j) authorizes the assessment of deficiencies for 1978, 1979 and 1980, attributable to the carryback of an investment credit claimed in 1981, until the statute of limitations for 1981 expires. It does not authorize the assessment of deficiencies which are unrelated to the carryback. Herman Bennett Co. v. Commissioner,65 T.C. 506, 509 (1975). See also Jones v. Commissioner,71 T.C. 391, 396-397↩ (1978). Therefore, petitioners' 1979 return is not open for purposes of disallowing their claimed investment credit on the farm property. 10. In the notice of deficiency, respondent recaptured the investment credit claimed in 1979 on the truck, tractor and fence. In portions of respondent's brief, however, he argues that it is the investment credit claimed on the barn that must be recaptured. Since we have found that none of the investment credit on the farm property can be recaptured in 1981, we need not resolve exactly what items of farm property are in question.↩
11. Respondent also disallowed a portion of the investment credit claimed on the Cessna. At trial, petitioners conceded this issue.↩
12. Respondent did not challenge these expenses on the grounds that they constituted pre-opening expenses under Richmond Television Corp. v. United States,345 F.2d 901, 907 (4th Cir. 1965), vacated and remanded on other issues 382 U.S. 68↩ (1965). Consequently, we need not address that argument.
13. No "pun" intended.↩
14. Some equipment was included in this purchase.↩
15. In the ACRS computation, petitioners' 1981 income tax return shows "1/2" taken. This multiplier represents petitioner's 50 percent interest in the enterprise rather than the period for which the deduction was computed.↩
16. Moreover, petitioners' 1981 income tax return listed the date the property was acquired as October 1981. Although petitioners' tax return is not self-proving and neither party is conclusively bound, Halle v. Comissioner,7 T.C. 245 (1946), affd. 175 F.2d 500 (2d Cir. 1949), cert. denied 338 U.S. 949 (1950), a taxpayer's characterization of an item on his income tax return may be considered as an admission on the part of the taxpayer. See Fed. R. Evid. 801(d)(2); Waring v. Commissioner,412 F.2d 800, 801 (3d Cir. 1969), affg. per curiam a Memorandum Opinion of this Court; Old Mission Portland Cement Co. v. Commissioner,69 F.2d 676, 680 (9th Cir. 1934), affd. on other grounds 293 U.S. 289 (1934); Siewert v. Commissioner,72 T.C. 326, 337 (1979); Times Tribune Co. v. Commissioner,20 T.C. 449, 452↩ (1953).
17. A "short taxable year" is any taxable year consisting of less than 12 months. ↩
18. Congress retroactively amended sec. 168(f)(5) to exclude 15-year real property from these rules. Secs. 102(a)(1) and 109, Technical Corrections Act of 1982, Pub. L. 97-448, 96 Stat. 2365, 2367, 2391.↩
19. John and David Pleva also had an arrangement with the mechanic employed by North Madison whereby he agreed to work for minimal compensation until he accumulated a one-third equity interest in the company. This employee terminated his employment before receiving any equity interest.↩
20. See secs. 761(a) and 7701(a)(2); M.H.S. Company v. Commissioner,T.C. Memo. 1976-165, affd. per curiam 575 F.2d 1177↩ (6th Cir. 1978).
21. In arguing that North Madison began its short taxable year in October 1981 and, therefore, may only claim one-quarter of the first annual ACRS deduction on its 5 year property, respondent relies on a proposed regulation. However, in this Court proposed regulations "carry no more weight than a position advanced on brief by the respondent." Miller v. Commissioner,70 T.C. 448, 460 (1978), quoting F.W. Woolworth Co. v. Commissioner,54 T.C. 1233, 1265-1266 (1970). See Freesen v. Commissioner,84 T.C. 920, 939 (1985), revd. on other grounds 798 F.2d 195 (7th Cir. 1986). We, therefore, have decided this issue by applying the language of the statute. See Laglia v. Commissioner,↩ 88 T.C.     (Apr. 13, 1987).
22. As stated in section 280A(a): No deduction otherwise allowable under this chapter shall be allowed with respect to the use of a dwelling unit which is used by the taxpayer during the taxable year as a residence.↩
23. We would reach the same result applying the test enunciated in Drucker v. Commissioner,715 F.2d 67 (2d Cir. 1983). See also Meiers v. Commissioner,782 F.2d 75 (7th Cir. 1986); Weissman v. Commissioner,751 F.2d 512↩ (2d Cir. 1983).