# United States Tax Court

T.C. Memo. 2024-35

SAVANNAH SHOALS, LLC, GREEN CREEK RESOURCES, LLC,
TAX MATTERS PARTNER,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 3412-22.                 Filed March 26, 2024.

————

*Jeffrey S. Luechtefeld*, *Hale E. Sheppard*, *John W. Hackney*, *Sean R. Gannon*, and *William A. Stone*, for petitioner.

*Christopher D. Bradley*, *Vassiliki Economides Farrior*, *Stephen A. Haller*, *Rubinder K. Bal*, *Edward A. Waters*, *Victoria J. Kanrek*, *Jeannette D. Pappas*, and *Alexandra E. Nicholaides*, for respondent.

## MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, *Judge*: On December 28, 2017, more than a 50% membership interest in Savannah Shoals, LLC (Shoals), a partnership for federal tax purposes, was sold, triggering its technical termination under section 708(b)(1)(B).[1] *See* § 708(b)(1)(B) (requiring a technical

———

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (Code), in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure. Some dollar amounts are rounded. The technical termination provision of section 708(b)(1)(B) was deleted in amendments to the Code in the Tax Cuts and Jobs Act of 2017, Pub. L. No. 115-97, § 13504(a), 131 Stat. 2054, 2141. The change was effective for partnership taxable years beginning after December 31, 2017. *Id.* § 13504(c), 131 Stat. at 2142.

**[*2]** termination of a partnership upon a sale or exchange of 50% or more of the total interest in the partnership's profits and capital within a 12-month period). Later that same day Shoals donated a conservation easement over 103 acres of undeveloped land in Hart County, Georgia (easement property). Shoals filed two partnership returns for 2017, one for a short taxable year ending on December 28, 2017, the date of the technical termination (Old Shoals), and one for a short taxable year ending December 31, 2017 (New Shoals), on which it claimed a $23 million charitable contribution deduction for the donation of the easement (easement deduction).

Respondent asserts that New Shoals's easement deduction should be disallowed in its entirety because New Shoals failed to meet substantive and reporting requirements for noncash charitable contribution deductions. He argues that New Shoals did not donate the easement within the taxable year ending December 31, 2017.[2] He also argues that it failed to satisfy two reporting requirements: (1) it failed to attach a qualified appraisal to its return, and (2) the appraisal summary attached to its return provided inconsistent information rendering it ineffective. We disagree with respondent and find that New Shoals satisfied the substantive and reporting requirements for a noncash charitable contribution deduction. Accordingly, it is entitled to an easement deduction equal to the easement's fair market value.[3] We determine that the easement had a fair market value of $480,000 on the date of its donation.

Respondent asserts a 40% penalty under section 6662(h) for a gross valuation misstatement and, alternatively, a 20% accuracy-related penalty for a substantial valuation misstatement under section 6662(a) and (b)(3). We find that the 40% penalty applies.[4]

---

[2] For simplicity, further references to December 28, 29, and 31, 2017, generally omit the year.

[3] Respondent argues that the easement property was inventory in New Shoals's hands and that section 170 limits the easement deduction to its adjusted basis in the easement property. *See* § 170(e)(1)(A) (reducing the amount of the charitable contribution deduction by the amount of gain that would not have qualified as long-term capital gain if the donated property had been sold at its fair market value on the date of the donation). We do not address this argument because we find that the easement's fair market value is less than New Shoals's basis.

[4] Respondent also asserts section 6662(a) and (b)(1) and (2) accuracy-related penalties for negligence or disregard of rules or regulations and a substantial understatement of income tax on the part of the underpayment attributable to New

[*3]                            FINDINGS OF FACT

Shoals is a Delaware limited liability company (LLC) that elected partnership status for federal income tax purposes. It is subject to the Tax Equity and Fiscal Responsibility Act (TEFRA).[5] When the Petition was timely filed, New Shoals's principal place of business was in Georgia. Petitioner, Green Creek Resources, LLC (Green Creek), is a Delaware LLC and is New Shoals's tax matters partner.

I.      *History of the Easement Property*

The easement property is 103 acres of rural, vacant land approximately 8 miles from Hartwell, Georgia, near Lake Hartwell. It is heavily wooded with rolling to steep terrain. It does not have any public road frontage and is accessed by a right of way via a dirt road. Shoals acquired the easement property from Savannah River Club, LLC (River Club), a real estate developer. Goldridge Group (Goldridge) owned River Club, and Gerard Koehn was Goldridge's president and a part owner.

In late 2007 River Club purchased 435.9 acres of land in Hart County for $5.2 million, approximately $12,000 per acre, in two purchases of 271.5 and 164.4 acres (River Club property). The 271.5-acre parcel included the easement property. River Club planned to develop a 325-lot residential community on the property marketed primarily to second-home buyers. It began work on the project. It received county approvals, performed grading, and began construction of roads and a gate house. Although the easement property was part of the planned community, no development occurred on it. In early 2008 River Club sold five lots, none of which was on the easement property. No homes were

---

Shoals's noncompliance with the substantive and reporting requirements, i.e., the part of the deduction up to the property's fair market value. Because we find that New Shoals complied with the reporting requirements, these penalties are not applicable.

Respondent also asserts a reportable transaction understatement penalty under section 6662A. In *Green Valley Investors, LLC v. Commissioner*, 159 T.C. 80, 103 (2022), we held that the imposition of the reportable transaction understatement penalty on conservation easements pursuant to I.R.S. Notice 2017-10, 2017-4 I.R.B 544, was invalid because it was issued without the notice and comment required by the Administrative Procedure Act. *See* 5 U.S.C. § 553.

[5] TEFRA, Pub. L. No. 97-248, §§ 401–407, 96 Stat. 324, 648–71, codified at sections 6221 through 6234, was repealed for returns filed for partnership tax years beginning after December 31, 2017.

[*4] ever constructed in the development. We understand that after the sale of the five lots the River Club property consisted of 429 acres.

In 2008 River Club stopped working on the development because of worsening economic conditions from the 2008 recession and its inability to secure additional financing. It decided to set the project aside and take a wait-and-see approach with the land. At some point it defaulted on a construction loan, and in 2010 the loan holder was awarded a judgment of approximately $2.1 million. The amount that River Club owed on the development is unclear from the record. In addition to the $2.1 million judgment award, it owed part of the original $5.2 million purchase price, fees to subcontractors, and unpaid real estate tax. During 2013 through 2016 River Club received multiple offers to purchase the River Club property for $1.3 to $1.5 million, approximately $3,000 to $3,500 per acre.[6] It declined the offers because they were too low.

II.  *Mr. Bland's Promotion Activities*

In August 2016 Green Creek was formed to promote conservation easements as a tax savings strategy. Green Creek promoted easement transactions in areas where there are known large quantities of crushed stone suitable for construction material, referred to as aggregate. The largest use of aggregate is road construction. Other uses are residential, office, and shopping center construction and public works projects. Green Creek valued the easements by taking the position that an aggregate quarry was the highest and best use of the properties unencumbered by the easements. Jeffery Bland, Green Creek's president, is a certified public accountant (CPA). Before Green Creek was formed, Mr. Bland had prior experience in structuring real estate investments that provided investors with purportedly three land-use options primarily to have investors grant conservation easements and claim charitable contribution deductions. He has no experience in the mining industry. No one associated with Green Creek had any experience in the mining industry.

During 2016 and 2017 Green Creek promoted at least five easement transactions.[7] Mr. Bland structured each easement

_____

[6] The record lacks information about activities or offers on the River Club property from 2008 through 2013.

[7] We find that Green Creek's other easement transactions are relevant. They tend to establish that the investors did not consider operating a quarry on the

[*5] transaction as follows. He formed two LLCs, one to hold the land (land LLC) and one to promote the easement transaction to investors (investor LLC). After agreeing to a sale price for the land, the landowner contributed the land to the land LLC in exchange for a membership interest. The land was the land LLC's sole or primary asset. Mr. Bland promoted and sold membership interests in the investor LLC. He set the offering price for the investor LLC to raise enough money to cover the agreed-upon sale price for the land along with fees and compensations. He represented to potential investors that the easement transactions would close by the end of 2017 so that they could obtain deductions for 2017. After the offering of the investor LLC was complete, the original landowner sold almost all of its membership interest in the land LLC to the investor LLC for the agreed-upon sale price for the land. In each case, the investor LLC voted to grant a conservation easement on the land. There was no serious consideration of operating a quarry.[8] The original landowner retained a small part of its interest in the land LLC and was allocated part of the easement deduction. For an easement transaction, Green Creek earned a termination fee of $850,000 to $950,000 if an investor elected to grant the easement, an arrangement fee of $500,000 to $600,000, and a management fee of $320,000.

Green Creek engaged multiple professionals to enable it to establish values for the properties on the basis of subsurface aggregate that is known to be abundant. It used the same professionals for the four transactions that it promoted in Georgia including Geo-Hydro Engineers, Inc. (Geo-Hydro), purportedly to test for aggregate on the properties, Richard C. Capps, an economic geologist, to value the aggregate and quarry operations, Ronald Foster to appraise the easements, and the law firm of Baker, Donelson, Bearman, Caldwell & Berkowitz, PC (Baker Donelson), to advise on the easement transactions and to provide an opinion letter supporting the easement deductions. For each of the four easement transactions that Green Creek promoted on land in Georgia, Green Creek had the easements valued at $22 to $23 million.

properties and tend to support respondent's position that a quarry was not a reasonably likely use of the easement property. *See Fox v. Commissioner*, 82 T.C. 1001, 1017 (1984) (considering nonparty transactions involving other customers of broker); *see also Brown v. Commissioner*, 85 T.C. 968, 999–1000 (1985), *aff'd. sub nom. Sochin v. Commissioner*, 843 F.2d 351 (9th Cir. 1988).

[8] It seems to us that if the investors had any interest in operating a quarry, they would have worked with someone with experience in mining.

[*6] III. *Land Evaluation*

In early 2017 George Agee and Corey Ingram, real estate brokers who worked with Mr. Bland to identify real property for easement transactions, brought the River Club property to Mr. Bland's attention. They also assisted Mr. Bland in negotiating with Goldridge and arranging to have the aggregate on the River Club property valued.

Goldridge agreed to dispose of the River Club property in three easement transactions that Green Creek would promote in exchange for a payout of $2.1 million. River Club received membership interests in Shoals and two other land LLCs and later sold nearly all of its membership interests in the three land LLCs to Investments and two other investor LLCs for a total of $2.1 million.[9] The Shoals transaction was the only one that occurred in 2017. River Club retained a minimal membership interest in each land LLC and was allocated part of each easement deduction. Mr. Koehn viewed the deal as a structured sale of the River Club property for $2.1 million. This is the highest offer that River Club received for the property. Mr. Koehn believed that $2.1 million would be sufficient to pay part of River Club's outstanding obligations. He separately negotiated repayment of River Club's debt in excess of $2.1 million.

Before Mr. Koehn agreed to the $2.1 million, he allowed Green Creek access to the River Club property so it could prepare its tax position that the highest and best use of the easement property was an aggregate quarry (proposed quarry) and establish a value for the aggregate so that Green Creek could market the easement transaction to investors. Mr. Koehn did not know that Green Creek had tested the land's subsurface materials when he agreed to the $2.1 million price.

A. *Drilling and Testing*

In July 2017 Geo-Hydro drilled exploratory holes (core holes) on the easement property to obtain samples of subsurface materials. Green Creek engaged Testing, Engineering & Consulting Services, Inc. (TEC), to test samples removed from four core holes. TEC concluded that the materials met the South Carolina and Georgia Departments of Transportation's requirements for crushed rock aggregate that is used

---

[9] River Club transferred approximately 209.7 acres to Savannah Preserve Holdings, LLC, and sold its membership interests for $1,004,970, and 116 acres to Cedar Falls Holdings, LLC, and sold its membership interests for $580,030.

**[\*7]** for road base. Geo-Hydro and TEC prepared reports of their findings. After testing, the core hole samples were not retained.[10]

B. *Colwell Letter of Intent and Quote*

In October 2017 Shoals paid $5,000 to Colwell Construction Co. (Colwell) for a letter of intent for development and general management services for the operation of a quarry. These services included startup and operating budget analysis, quarry design and development, and equipment procurement, for an hourly fee of $250. By separate letter Colwell provided a quote for rock crushing services of $8.75 per ton for the first year of operations with annual 3% price increases. The quote does not include startup costs or drilling and blasting costs.

C. *Dr. Capps's Report*

In October 2017 Dr. Capps prepared an overview of a proposed quarry on the easement property and the profitability of operating the proposed quarry. He determined that the net present value of minable aggregate on the easement property was $23.1 million using a discounted cashflow analysis. He also prepared a supplement report as an expert witness for trial. He is not a real estate appraiser and did not provide a fair market value of the unencumbered easement property. For his valuation, he determined that a 40-acre quarry could produce 10.5 million tons of aggregate over 25 years that is sold for $15.75 per ton as follows: 300,000 tons in years 1 and 2 and 400,000 tons in years 3 through 7 with an annual 1% increase in years 8 through 25.[11] He relied on Colwell's $8.75 per ton price quote for operating costs and

---

[10] The parties disagree over what to call the subsurface materials. Their experts also refer to the subsurface materials by different names including biotite gneiss and granitic gneiss. Notably, TEC does not use either term in its report. It uses aggregate, and we adopted its term.

[11] In his report Dr. Capps erroneously used the terms "mineral reserve" and "mineral resource" to describe the easement property's aggregate. Both terms have special meanings in the mining industry, and both a mineral reserve and a mineral resource must be identified through a feasibility study. The drilling and testing that Geo-Hydro and TEC conducted do not satisfy the industry guidelines for a feasibility study that is required to declare either a mineral resource or a mineral reserve. Accordingly, it was inappropriate for Dr. Capps to use these terms to refer to the easement property's aggregate according to industry standards. Dr. Capps attempted to downplay his use of these terms as typos that do not affect his valuation. We disagree and find that these mistakes go directly to the reliability of his report and the reports of petitioner's other experts that relied on Dr. Capps's opinions. Petitioner's expert at trial Doug Kenny, discussed *infra* Part VII.A.2, relied on Dr. Capps's report and also erroneously used both terms in his report.

[*8] applied a discount rate of 11% to calculate the net present value. He did not adjust the price of aggregate or the operating costs for inflation and did not account for any startup expenses.

Dr. Capps determined that the market for the proposed quarry encompassed an area within a 50-mile radius of the quarry. He explained that the demand for aggregate is highly dependent on population growth and construction activity. He estimated that the 50-mile radius market area had an annual demand for 8 million tons of aggregate and the proposed quarry could capture 5% of the market. Accordingly, he determined that the market would support his production projection of about 400,000 tons annually.

IV.  *Hart County*

Hart County is in northeast Georgia along Georgia's border with South Carolina. It is largely rural and agricultural. It does not have zoning laws; land use is controlled through land use ordinances. A quarry is a legally permissible use of the easement property; no ordinances prohibit or regulate mining. There were no quarries operating in the county. The county would defer to the procedures of the Environmental Protection Division (EPD) of the Georgia Department of Natural Resources to regulate the development and operation of a quarry. Shoals would have been required to obtain EPD permits including permits relating to stormwater and wastewater discharge, surface and ground water withdrawal, and air quality to operate a quarry. The county might have imposed a 120- to 180-day moratorium so that it could enact an ordinance regulating mining.

Aggregate is abundant in Hart County and throughout Georgia and southwestern South Carolina. The market for aggregate is generally limited to the area surrounding the quarry because of the costs of transporting aggregate, which the buyer typically pays. We refer to the price of aggregate plus the buyer's transportation costs as the delivered price. According to Dr. Capps, the cost to transport aggregate by truck is 15 to 25 cents per ton per mile. Demand for aggregate depends on population and population growth as well as commercial growth. The easement property is approximately 20 miles southwest of the city of Anderson, South Carolina, 50 miles southwest of Greenville, South Carolina, 50 miles northeast of Athens, Georgia, and 100 miles northeast of Atlanta, Georgia.

**[*9]**    In 2017 Hart County had a population of approximately 25,000. In the years leading up to the easement's grant, Hart County's population growth was flat. From 2010 to 2017 its population increased by 495 residents. Around 2017 the county was experiencing commercial growth that was expected to add approximately 1,400 jobs. Approximately 217,000 people lived within 25 miles of the easement property,[12] and approximately 1 million lived within 50 miles. Part of the Greenville metro area, which includes parts of Anderson County and Greenville and Spartanburg, South Carolina, was within the 50-mile radius.[13] From 2010 to 2017 the population of the Greenville metro area grew by 1.2%.

For real estate tax assessment purposes, Hart County divides land into five zones on the basis of accessibility and desirability. It determines a parcel's zone on the basis of its desirability using land sale price data. Land in zone 1 is the most desirable and includes land near Lake Hartwell and in the city of Hartwell. Land in zone 5 is the least desirable. The easement property is in zone 5. Hart County's 2017 tax records indicate that the easement property was valued at $550,587 for assessment purposes.

V.    *Easement Transaction*

On October 12, 2017, Shoals was formed, owned 95% by River Club and 5% by Green Creek. River Club agreed to contribute the easement property to Shoals in exchange for the 95% membership interest. Green Creek agreed to provide services as Shoals' manager for its interest. That same day, Savannah Shoals Investments, LLC (Investments), the investor LLC, entered into an agreement with River Club to purchase 92% of its Shoals membership interests for $515,000. Shoals's operating agreement was amended to permit the transfer and to include Investments as a member of Shoals. The agreement identifies the easement property as Shoals's sole asset.

---

[12] The area within a 25-mile radius of the easement property includes parts of the county of Anderson, South Carolina, which had a population of approximately 206,000. The city of Anderson had a population of approximately 30,000.

[13] The Greenville metro area had a population of approximately 1 million people, some of whom lived outside the area within a 50-mile radius of the proposed quarry. The city of Spartanburg is approximately 90 miles from the easement property.

**[\*10]** On November 30, 2017, River Club transferred the easement property to Shoals by limited warranty deed.[14] The deed was recorded on December 6, 2017. On December 11, 2017, Shoals and Investments each entered into management agreements with Green Creek. That same day Investments issued a private placement memorandum (PPM) to potential investors. The PPM states that the purpose of the offering is to raise money to purchase a 92% interest in Shoals from River Club for $515,000. It identifies the easement property as Shoals's sole asset and proposes three uses for the land: operating a quarry, granting a conservation easement, or holding it for investment for an indefinite period. Mr. Bland represented to Baker Donelson that the $515,000 purchase price represented a price of $5,000 per acre for the easement property. He also represented to Baker Donelson for purposes of its opinion letter that the easement transaction would close by the end of 2017.

On December 28, 2017, before 9:30 a.m., Investments completed its purchase of a 92% membership interest in Shoals from River Club by paying the $515,000 purchase price as follows: $415,000 paid directly to River Club and $100,000 paid into escrow. No later than 12:05 p.m., the escrowed funds had been disbursed. After the transfer Investments owned 92% of Shoals and the remaining 8% was owned 3% by River Club and 5% by Green Creek. On that same day Investments' members began the voting process on the three options for the easement property as outlined in the PPM. Mr. Bland wanted to close the easement transaction by the end of 2017 so that investors could obtain the deductions that he had marketed.

By noon on December 28, a majority of Investments' members had already voted to grant the easement. Once a majority was reached, Shoals did not wait for all members to vote. It executed a deed granting a conservation easement (easement deed) to Southeast Regional Land Conservancy, Inc. (SERLC), a qualified organization as defined in section 170(h)(1)(B). The deed was recorded at 4:46 p.m. on December 28. The easement deed permits agricultural activities related to personal use, ecological restoration, and habitat enhancement improvement and bars industrial use and large-scale commercial agricultural activities.

---

[14] That same day a lien holder released a lien on the easement property by quitclaim deed to Shoals.

**[\*11]** VI.  *Tax Returns and Notice of Final Partnership Administrative Adjustment*

River Club's sale of the 92% membership interest triggered a technical termination of Old Shoals that ended its partnership taxable year. Old Shoals timely filed a partnership return electronically for the taxable year October 12 to December 28. Old Shoals reported the technical termination but did not claim the easement deduction. New Shoals timely filed a partnership return electronically for the taxable year ending December 31 on which it claimed the easement deduction. The first page of the return shows New Shoals's taxable year as December 29 to 31. Attached to the return were: (1) Form 8283, Noncash Charitable Contributions, on which New Shoals reported that the donation date was December 28, (2) SERLC's written acknowledgment letter that states that it received the donation on December 28, and (3) a copy of the easement deed showing that it was recorded on December 28. Also attached to New Shoals's partnership return were Schedules K–1, Partner's Share of Income, Deductions, Credits, etc., that reported each partner's share of the easement deduction in accordance with New Shoals's ownership after River Club's sale of a 92% interest to Investments. Thus, the December 29 start date shown on the return is inconsistent with other parts of the return. New Shoals attached Form 8886, Reportable Transaction Disclosure Statement, to the return identifying the easement deduction as a syndicated conservation easement as described in Notice 2017-10.

Elizabeth Salvati, a CPA with HLB Gross Collins, PC (Gross Collins), signed Old Shoals's and New Shoals's returns as the preparer. Initially, Gross Collins prepared a draft return for New Shoals with a start date of December 27. Mr. Bland reviewed the draft and questioned whether December 27 was the correct start date. He stated that they needed to make sure that New Shoals's taxable year started on the appropriate date and reminded Ms. Salvati that Investments purchased its interest in Shoals and New Shoals granted the easement on December 28. Thereafter, Gross Collins prepared New Shoals's partnership taxable year return with a start date of December 28 and attempted to file it electronically. The Internal Revenue Service's (IRS) electronic filing system rejected the return, which Ms. Salvati understood was because its start date was the same as the end date reported on Old Shoals's return. Ms. Salvati contacted the provider of the return preparation and electronic filing software (return preparation software) that Gross Collins used, which advised her to change the start date to December 29 to allow for electronic filing. Ms.

[*12] Salvati changed the start date as shown on the top of page 1 of the return but did not change other parts of the return that reported that the easement donation occurred on December 28, as discussed above. New Shoals retained a copy of that draft that showed New Shoals's taxable year as December 28 to 31.

A.    *Foster Appraisal*

New Shoals attached to its return an appraisal of the easement that was prepared by Mr. Foster, dated December 1, 2017 (Foster appraisal).[15] In preparing his appraisal, Mr. Foster relied on Dr. Capps's report, the Geo-Hydro and TEC reports, and the Colwell letter of intent. He did not research the ownership or sales history of the easement property. He did not know that Shoals acquired the easement property on November 30, 2017. Nor did he know the details of the acquisition including that River Club was the transferor, that it received a 95% membership interest in Shoals in exchange for the property, or that it sold a 92% interest in Shoals for $515,000. Mr. Bland failed to disclose these facts to Mr. Foster. In the appraisal, Mr. Foster states that there are no known sales of the easement property within four years of the valuation date and no current agreement to sell it.

The Foster appraisal does not state the date or expected date of the easement donation as required by Treasury Regulation § 1.170A-13 and omits other required information. It does not state the date on which Shoals acquired the easement property. It does not provide Mr. Foster's college degree although it lists his professional licenses, memberships, and compliance with continuing education requirements and identifies him as a member of the Appraisal Institute with the acronym MAI following his name. It further states that Mr. Foster holds himself out as an appraiser and performs appraisals regularly, but the appraisal does not provide specific information about his appraisal experience.

In the appraisal, Mr. Foster indicated that he was valuing a conservation easement and described the easement as conserving the property's natural, scenic, agricultural, and open space. He stated that the easement deed prohibited mining and restricted development but did not provide any further details about the deed's use restrictions. He failed to state that the deed limited SERLC's right to transfer the easement.

---

[15] The date of the Foster appraisal is approximately one month before the easement's donation. Respondent has not objected to the appraisal on this ground.

[*13] Mr. Foster used the "before and after" method to value the easement. *See* Treas. Reg. § 1.170A-14(h)(3)(i) and (ii). He determined the before value on the basis that unencumbered, the highest and best use was as an aggregate quarry. He performed a discounted cashflow analysis of income from a quarry. He determined that the net present value of aggregate produced from the easement property over 25 years was $23.1 million, the same net present value that Dr. Capps determined. Mr. Foster copied Dr. Capps's production estimates, price for aggregate, operating costs, and discount rate and did not account for any capital expenditures in his analysis. Mr. Foster adopted the net present value of the aggregate as the before value of the land. He determined that after the easement's grant, the property's fair market value was $103,000 (after value) and opined that the easement's fair market value was approximately $23 million.

B.    *Form 8283*

Form 8283 is the form that the IRS prescribes for an appraisal summary. *See* Treas. Reg. § 1.170A-13(c)(4)(i)(A). Attorneys with Baker, Donelson prepared Form 8283 (Baker Donelson Form 8283) for the easement donation, and Ms. Salvati reviewed it. Page 2 of the Baker Donelson Form 8283 correctly reported that Shoals acquired the property by contribution and that it had an adjusted basis in the property of $1,538,622. It also reported that the easement had an appraised value of $23 million, for which New Shoals claimed a charitable contribution deduction. Mr. Foster and James Wright, SERLC's executive director, signed it.

Gross Collins attempted to attach a pdf copy of the Baker Donelson Form 8283 to New Shoals's return. However, its return preparation software did not recognize the pdf copy, and Gross Collins received an error message that the return failed to include Form 8283. Gross Collins prepared Form 8283 generated by the software (Gross Collins Form 8283) but mistakenly provided different information on page 2 from that on the Baker Donelson Form 8283. It reported that Shoals acquired the property by purchase, its adjusted basis was $37,776, and the appraisal value and the easement deduction were $22.2 million. Ms. Salvati did not explain why the Gross Collins Form 8283 differed from Baker Donelson's. Neither Mr. Foster nor Mr. Wright signed the Gross Collins Form 8283. Both versions of Form 8283 refer to an attachment for required information relating to the easement deduction. There is only one attachment, which is consistent with the Baker Donelson Form 8283.

**[\*14]** C.  *Issuance of FPAA*

On December 21, 2021, respondent issued a notice of final partnership administrative adjustment (FPAA) to New Shoals disallowing the $23 million easement contribution deduction and asserting penalties. The FPAA identifies New Shoals's taxable year at issue as the taxable year ending December 31. It does not state the start date of the December 31 taxable year. Respondent complied with the written supervisory approval requirement of section 6751(b) for each penalty. *See* Order (Mar. 11, 2023).

VII.  *Expert Testimony*

A.  *Petitioner's Experts*

Petitioner engaged Gregory Gold and Doug Kenny as experts to value the easement property's subsurface materials. Both men relied on Geo-Hydro's and TEC's reports. Mr. Kenny also relied on Dr. Capps's and Mr. Gold's reports.

1.  *Mr. Gold's Report*

Mr. Gold opined that "the fair market value of the economically recoverable gneiss resource" on the easement property is $30.1 million. He assumed that the highest and best use for the easement property was aggregate mining. Using a discounted cashflow analysis, he calculated that aggregate mined over 30 years had a net present value of $27,645,635 and the unmined aggregate at the end of 30 years had a terminal value of $2,460,048, for a total value of the aggregate of $30,105,683. He testified that the easement property holds approximately 32 million tons of subsurface aggregate and determined that the proposed quarry could produce 19.6 million tons of aggregate over 30 years. He priced the aggregate on the basis of its quality, $20.48 per ton for premium aggregate and $13.93 per ton for nonpremium aggregate.[16] He estimated average sales of 360,000 tons of premium aggregate and 180,000 tons of nonpremium aggregate annually. For his cost analysis, he assumed that the owner would operate the proposed quarry and calculated that the owner-operator would incur initial capital expenses of $14.8 million including $3.2 million for development capital, $5.5 million for mining equipment, and $6.1 million for a processing plant. He estimated that an owner-operated quarry would

---

[16] Mr. Gold discounted the aggregate prices during the first three years of production to account for the proposed quarry's status as a new market entrant.

**[*15]** have operating costs of $5.41 per ton. He also accounted for other costs including reclamation, insurance, overhead, and tax. He applied a discount rate of 10% to determine the net present value.

### 2. *Mr. Kenny's Report*

Mr. Kenny performed a discounted cashflow analysis in which he determined that the net present value from a quarry operating on the easement property for 26 years is $21 million. On the basis of this analysis, he opined that a quarry was financially feasible and was the unencumbered easement property's highest and best use. He used a before and after method to value the easement. He opined that the before value was $21,075,000 ($204,612 per acre), the same as the mined aggregate's net present value. He opined that after the easement's grant, the property's highest and best use is agriculture, recreational use, and forestry. He determined that the after value was $290,000 and the easement's fair market value was $20,785,000.

Mr. Kenny testified that when valuing land with subsurface materials, the value of the materials must be considered. He performed a discounted cashflow analysis in which he estimated that the proposed quarry would have sold 10.5 million tons of aggregate over 26 years with production starting in year 2 as follows: 300,000 tons in years 2 and 3, 400,000 tons in years 4 to 7, and a 1% annual increase during years 8 to 26. He did not include any production in year 1 because he opined that it would have primarily involved development activities such as permitting, site preparation, access road construction, clearing, and utility infrastructure. He priced the aggregate at $15.75 per ton in year 2 with annual price increases of 3.15%. He estimated costs under the assumption that a contractor (rather than the owner) would have operated the quarry. He testified that contractor-operated quarries have lower capital costs than owner-operated quarries but higher per-ton operating costs. He estimated that an owner of a contractor-operated quarry would incur $3.2 million in startup costs and would have operating costs of $8.75 per ton with annual cost increases of 3%. He also accounted for administrative and management costs, property tax, a surety bond, equipment replacement, contingency reserves, and reclamation costs, and applied a discount rate of 11% to arrive at his net present value.

Mr. Kenny testified about population in Georgia but did not conduct his own analysis of demand for aggregate from the proposed quarry. Instead, he cited Dr. Capps's and Mr. Gold's demand estimates,

[*16] 7.2 and 8 million tons annually of aggregate, and determined that the proposed quarry would have captured approximately 5% of the market within five years of beginning production. He testified that this analysis confirmed that his annual production of 400,000 tons is reasonable.

B.     *Respondent's Experts*

Respondent engaged Charles Brigden to prepare a real estate valuation and Kevin Gunesch to determine whether a quarry was financially feasible.

1.     *Mr. Brigden's Report*

Mr. Brigden used the before and after valuation method to determine the easement's fair market value. He used a comparable sales method to determine both the before and after values. He determined a before value of $420,000 (approximately $4,100 per acre) and an after value of $100,000, for a fair market value of the easement of $320,000.

Mr. Brigden determined that the unencumbered easement property's highest and best use was low-density residential and recreational uses. He did not perform an income analysis of a quarry to determine the highest and best use. He opined that there was no need to conduct such an analysis because mine operators do not conduct them before purchasing land to mine. He testified that such studies are not necessary because aggregate is abundant and quarry owners purchase land on the basis of access to transportation and the property's location relative to market demand. To determine the highest and best use, he analyzed the market for vacant land in Hart County. He testified that a quarry was not a likely use on the basis of land use patterns in the county, the nature of existing transportation infrastructure near the easement property, the lack of an apparent demand for property on which to operate a quarry, and the use that landowners actually made of their properties. He testified that aggregate is abundant in the region and the easement property did not provide a comparative advantage over other vacant parcels that could have been mined.

For his comparable property sales analysis, Mr. Brigden began by considering the sale prices of vacant land in Hart County in sales of over 25 acres. He testified that from 2006 to 2022 the median price for such sales was approximately $3,000 per acre and the highest price was $63,750 per acre. Next, he considered the sales of parcels between 50 and 200 acres. He determined that the average and median prices were

[*17] $4,513 and $4,330 per acre, respectively, with prices ranging from $1,649 to $12,000 per acre after he eliminated two sales of land on Lake Hartwell that he considered to be outliers.[17] From these sales he identified four properties that he determined were similar to the unencumbered easement property (comparables). They ranged in price from $2,550 to $5,256 per acre: (1) 54 acres sold for $240,000 ($4,435 per acre) in July 2017; (2) 87 acres sold for $413,400 ($4,752 per acre) in April 2017; (3) 41.9 acres sold for $220,000 ($5,256 per acre) in February 2016; and (4) 190 acres sold for $484,576 ($2,550 per acre) in December 2015.

Mr. Brigden adjusted the prices of the comparables to account for differences in physical characteristics of the land relative to the easement property and the dates of the sales. He determined average and median adjusted prices for the four comparables of $3,693 and $4,014 per acre, respectively. Using these comparables, he determined a before value of $420,000, approximately $4,100 per acre. He opined that the $515,000 sale price for 92% of River Club's membership interest in Shoals is consistent with the price data from the four comparables and "appears to be generally reflective of fair market value pricing" for the unencumbered easement property.

Respondent requested that Mr. Brigden determine a before value under the assumption that a quarry was the highest and best use of the property. Mr. Brigden used a comparable property sale method to value the unencumbered easement property for use as an aggregate quarry. In his initial report he identified nine sales from 2011 to 2019 of mining-use property.[18] In his rebuttal report he expanded the timeframe to 2009 through 2021 and identified five additional sales. These properties were generally within a 50-mile radius of the easement property. The prices in these 14 sales ranged from $1,895 to $34,928 per acre with average and median prices of $8,325 and $6,801 per acre, respectively.[19] Mr. Brigden adjusted the prices for 5% annual appreciation to account for

---

[17] The two waterfront properties sold for approximately $40,000 and $28,000 per acre.

[18] Mr. Brigden included sales of land with active quarries and former quarries and land purchased for future extraction or for expansion of an existing quarry. We adopted this definition of mining-use property.

[19] Mr. Brigden testified that the $34,928-per-acre sale was land purchased to expand an existing quarry. He opined that the price was significantly higher because the quarry was in an area with heavy industrial land use and ready access to transportation, which resulted in an increased demand for land. He adjusted the price to $29,157 per acre to account for the purchase having occurred in September 2021.

**[*18]** differences between the sale dates and the valuation date. He determined adjusted prices ranging from $1,645 to $28,157 per acre with average and median adjusted prices of $8,532 and $7,392 per acre, respectively. He opined that had he agreed that mining was the most likely use of the unencumbered easement property, he would have determined a before value of $770,000, approximately $7,500 per acre. He further opined that even where a quarry is the highest and best use of the land, from 2014 to 2017 there was a negligible difference in prices for land with known deposits over land without known deposits. He concluded that land with known aggregate deposits does not enjoy a price premium above land without known deposits.

### 2.    *Mr. Gunesch's Report*

Mr. Gunesch performed a discounted cashflow analysis of a quarry on the unencumbered easement property and determined that the aggregate mined over 25 years had a net present value of $2.9 million. He opined that the easement property could have produced approximately 10.3 million tons of salable aggregate over 25 years which he divided into two categories on the basis of quality for pricing purposes: 8.9 million tons of unweathered aggregate at $22 per ton and 1.4 million tons of weathered aggregate at $15.75 per ton.[20] Under his analysis, the quarry would have produced an average of over 400,000 tons annually, similar to Dr. Capps's and Mr. Kenny's projections but less than Mr. Gold's 600,000-ton annual production projection. Mr. Gunesch estimated operating costs at $15.81 per ton. He estimated $2.7 million in capital costs including testing, permitting, and infrastructure improvements, plus additional amounts for soil stripping, income tax, and administrative expenses. In his analysis, he applied the same 11% discount rate as petitioner's experts but criticized it as too low. Although he determined a positive net present value of the aggregate from a quarry on the easement property ($2.9 million), he concluded that a quarry was not financially feasible. He opined that multiple factors that he did not account for in his analysis would likely result in a negative net present value such as factoring in unaccounted-for upfront costs, increased operating costs, or decreased sales or production.

Mr. Gunesch determined that the market for the proposed quarry's aggregate was smaller than petitioner's experts projected. He

---

[20] According to Mr. Gunesch, weathered rock is rock that has been degraded by natural weathering processes and is weaker than rock at greater depth where it is protected from natural weathering.

**[\*19]** limited the market primarily to the area where the proposed quarry would have been the closest source of aggregate. He determined that because of the location of competing quarries the market was a maximum of 20 miles northwest and southeast of the easement property and 6 miles southwest and northeast of the property (preferred market). He further opined that the easement property's location and distance from the site where the aggregate would likely be used (point of use) precludes it from being a viable competitive alternative to existing quarries. He opined that existing quarries produced adequate supply to meet demand and there was insufficient demand to support 400,000 tons of annual sales. He further testified that there was a high risk that projected annual sales would not be realized. He testified that even if the proposed quarry were to capture the entire preferred market, the proposed quarry would sell 383,000 tons of aggregate annually.

OPINION

Section 170(a)(1) allows taxpayers to deduct the fair market values of charitable contributions of property made within the taxable year if the contributions are verified in accordance with substantiation and reporting requirements prescribed in the Treasury regulations. *See* Treas. Reg. § 1.170A-1(c)(1). Section 170(f)(11) imposes heightened substantiation requirements for the contribution of property where the amount of the deduction depends on the value of the donated property. *See Cave Buttes, L.L.C. v. Commissioner*, 147 T.C. 338, 347–48 (2016); *Albrecht v. Commissioner*, T.C. Memo. 2022-53, at \*3. For deductions greater than $5,000, taxpayers must obtain a qualified appraisal of the donated property. § 170(f)(11)(C). For deductions of more than $500,000, taxpayers must attach the qualified appraisal and a fully completed appraisal summary to the return for the taxable year that it claims or reports the deduction. § 170(f)(11)(D).

Partnerships cannot claim charitable contribution deductions. § 703(a)(2)(C). Instead, each partner takes into account his distributive share of the partnership's charitable contributions. § 702(a)(4); *see also* Treas. Reg. § 1.703-1(a)(2)(iv) ("Each partner is considered as having paid within his taxable year his distributive share of any contribution or gift, payment of which was actually made by the partnership within its taxable year ending within or with the partner's taxable year."). The partnership must report the deduction and the amount of each partner's distributive share of the deduction on the partnership return. § 6031(a).

**[*20]** I.     *New Shoals's Taxable Year*

Taxpayers compute taxable income and file returns for periods known as taxable years. § 441(a); Treas. Reg. § 1.441-1(a)(1). "[E]ach 'taxable year' must be treated as a separate unit, and all items of gross income and deduction must be reflected in terms of their posture at the close of such year." *United States v. Consol. Edison Co. of N.Y.*, 366 U.S. 380, 384 (1961). In general, the term "taxable year" is defined as the taxpayer's annual accounting period, either a calendar or fiscal year. §§ 441(b)(1), 7701(a)(23). When a taxpayer exists for a period of less than 12 months (short period), it is required to file a return for the short period in which it exists. §§ 443(a)(2), 7701(a)(23); Treas. Reg. § 1.443-1(a)(2). When a taxpayer exists and files a return for a short period, the term "taxable year" means "the period for which the return is made." §§ 441(b)(3), 7701(a)(23); Treas. Reg. § 1.441-1(b)(1)(i).

Although partnerships are not subject to tax, they must file returns for each taxable year in which they exist. §§ 701, 6031(a). Section 706 and the accompanying regulations provide rules for determining a partnership's taxable year. *See* Treas. Reg. § 1.441-1(b)(2)(i)(G) (stating that partnerships must use the required partnership year determined under section 706 and the accompanying regulations). A partnership's taxable year is determined as though the partnership is a taxpayer. § 706(b)(1)(A). A partnership will have a short taxable year if the partnership terminates during its taxable year. The partnership taxable year closes for all partners when the partnership terminates. Treas. Reg. § 1.706-1(c). In general, a partnership's taxable year does not close when a partner sells all or part of its partnership interest.[21] § 706(c) (providing that a partnership taxable year does not close as the result of the addition of a new partner, a partner's death, or the liquidation, sale, or exchange of a partnership interest). The technical termination provision of section 708(b)(1)(B) is an exception to the general rule that a sale of a partnership interest does not terminate the partnership taxable year.

---

[21] If a partner sells its entire interest, the partnership taxable year closes only with respect to the selling partner. Treas. Reg. § 1.706-1(c)(2). The partnership taxable year does not close for the other partners. If a partner sells less than its entire interest, the partnership taxable year does not close for the selling partner. Rather, special rules apply for computing the selling partner's distributive share before and after the partial sale. This procedure is known as the varying interest rule, under which the partner's distributive share is determined by taking into account its varying interests during the partnership taxable year. § 706(c)(2); Treas. Reg. § 1.706-4(a).

**[\*21]** A.    *Technical Termination*

Under section 708(b)(1)(B) a partnership terminates when 50% or more of its total capital and profits interest is sold or exchanged within a 12-month period and the partnership's taxable year closes for all partners as of the date of the technical termination. Treas. Reg. § 1.708-1(b)(3) and (4); *see* Treas. Reg. § 1.706-1(c)(1) (stating that a partnership's taxable year closes for all partners when the partnership terminates). Thus, a partnership has a short period when there is a technical termination and is required to file a return for the terminated taxable year. *See* § 443(a)(2). The date of the technical termination is the date of the sale or exchange of a partnership interest that itself or together with other sales or exchanges in the preceding 12 months results in the transfer of 50% or more of the partnership's capital and profits interests. Treas. Reg. § 1.708-1(b)(3)(ii).

On a technical termination, a new partnership is deemed formed and it must also file a separate partnership return for the remaining period of the partnership taxable year. Pursuant to the Treasury regulations, the terminated partnership is deemed to have contributed its assets and liabilities to a new partnership in exchange for an interest in the new partnership, and "immediately thereafter" the terminated partnership is deemed to have distributed the interests in the new partnership to the partners in liquidation of the terminated partnership. Treas. Reg. § 1.708-1(b)(4). For purposes of state law, the partnership continues to exist as the same entity. *See Harbor Cove Marina Partners P'ship v. Commissione*r, 123 T.C. 64, 80 (2004) (holding that the dissolution of a partnership is governed by state law).

On December 28, 2017, River Club sold a 92% interest in Shoals to Investments. The sale terminated Old Shoals's taxable year, and New Shoals was deemed to be formed. The parties agree that Old Shoals's taxable year ended on December 28, the date of the technical termination, and that Old Shoals properly filed a return for the taxable year October 12 to December 28. The parties disagree over the starting date of New Shoals's taxable year. Petitioner argues that it started on December 28, the day of the technical termination; respondent argues it started on December 29. We hold that New Shoals had a taxable year December 28 to 31, for which it may claim the easement deduction.

Respondent's argument for a December 29 start date is two-fold. First, he argues that New Shoals's return reported its taxable year was December 29 to 31, and the Court should hold it to that reported taxable

[*22] year. Second, he argues that on a technical termination, the Code and the Treasury regulations require a new partnership taxable year to start the day after the technical termination. Thus, according to respondent, December 29 to 31 is New Shoals's correct taxable year. He argues that New Shoals is not entitled to the easement deduction for the taxable year December 29 to 31 because it did not donate within that taxable year as required by section 170(a).

B.      *Jurisdiction to Determine Start Date*

Before we address the substantive issue of the start date, we note that we have jurisdiction to determine when New Shoals's taxable year begins. We have jurisdiction in a partnership proceeding to determine the date on which the partnership's taxable year begins because the starting date of a partnership's taxable year determines the partnership items over which we have jurisdiction. *See* § 6226(f). The determination of a partnership's proper taxable year is a partnership item. Treas. Reg. § 301.6231(a)(3)-1(b); *see* § 6231(a)(3) (defining a partnership item). Thus, the proper beginning and ending dates of a partnership's taxable year are partnership items to be determined in a partnership proceeding where the FPAA places the start date at issue. *Harman Road Prop., LLC v. Commissioner*, T.C. Memo. 2023-143, at *7 (holding that the start date of a short taxable year following a technical termination is a partnership item that may be adjusted in a partnership proceeding). The FPAA states the end date of New Shoals's taxable year but does not state the start date. Thus, the correct start date of the taxable year ending December 31 is a partnership item over which we have jurisdiction in a partnership proceeding.

C.      *Start Date Reported on New Shoals's Return*

The parties disagree over what date New Shoals's return reported as the start date. The second line of the return, under the form's title, shows its taxable year is December 29 to 31. This is the only part of the return that treats the start date as December 29. Otherwise, the return reports partnership items that correspond to the taxable year December 28 to 31, including Form 8283, the donee's written acknowledgment letter, and a copy of the easement deed. Ms. Salvati testified that she prepared drafts of New Shoals's return with different start dates. She discussed the significance of the technical termination date and the start date with Mr. Bland. She credibly testified that she prepared New Shoals's return with a December 28 start date and attempted to file it electronically, but the IRS rejected it. She credibly testified that upon

**[\*23]** the advice of the software provider, she changed the start date shown on the return to December 29 to permit electronic filing. In the light of this credible testimony and reporting on other parts of New Shoals's return of partnership items incurred on December 28, we find that New Shoals reported a taxable year December 28 to 31. New Shoals mistakenly showed its taxable year starting on December 29 only because of the limitations with return preparation software.

## D.   *Permissible Start Date After a Technical Termination*

Next, we turn to the legal question of whether a new partnership that is deemed to form on a technical termination may use a taxable year that starts on the date of the termination. Respondent argues that the Treasury regulations require the new partnership's taxable year to begin the date after the technical termination. The Treasury regulations address the date of the technical termination of the old partnership but not the date on which the new partnership's taxable year begins. *See* Treas. Reg. § 1.708-1(b)(3). The regulations simply say that the new partnership is formed "immediately" after the technical termination.[22] *Id.* subpara. (4). The regulations say nothing expressly about the start of the partnership year. Moreover, the phrase "immediately thereafter" does not mean the next day.

Respondent has not analyzed the text of the regulations or the meaning of the phrase "immediately thereafter." He simply argues that the regulations require the new partnership's year to start the day after the technical termination. We agree with petitioner that the phrase "immediately thereafter" does not prohibit the new partnership's taxable year from beginning on the date of the technical termination. We have allowed taxpayers to begin a new short year on the same day that their former short year ended. *See Moore v. Commissioner*, 70 T.C. 1024, 1032 (1978); *see also Mill Road 36 Henry, LLC v. Commissioner*,

---

[22] Other parts of the regulations relating to end and start dates of taxable years are more precise. For example, Treasury Regulation § 1.708-1(d)(2)(i) clearly states that when a partnership divides into two or more partnerships, the continuing and new partnerships must file separate returns for the taxable year beginning "after the date of the division." Treasury Regulation § 1.706-4(c) clearly states that when a partner sells part of its interest, its distributive share is determined as of the end of the day that the partner sold its interest. *Id.* subpara. (1); *see also* Treas. Reg. § 1.443-1(a)(1) (requiring a taxpayer that changes its annual accounting period to file a short year return "beginning with the day following the close of the old taxable year"); *see also id.* para. (b)(2)(ii) (explaining that when a taxpayer has a short taxable year because of a change in its annual accounting period, the period ends "at the close of the last day of the short period").

[*24] T.C. Memo. 2023-129, at *21 & n.14 (involving a partnership formed upon a technical termination that started its taxable year on the date of the technical termination).

Beginning New Shoals's taxable year on December 28 is consistent with the basic principles of partnership tax law under TEFRA. Generally, a partnership comes into existence for federal tax purposes and must file a return beginning when it realizes income or incurs an expense. *See Williams v. Commissioner*, T.C. Memo. 1987-308, 53 T.C.M. (CCH) 1203, 1210 (citing § 6031 and Treas. Reg. § 1.6031-1(a)); *see also* § 761(a) (defining the term "partnership" and generally requiring the conduct of a business activity, financial operations, or venture). New Shoals began to conduct business on December 28. Its members voted to donate the easement on December 28, and the deed was executed and recorded that day.[23] Respondent's position directly conflicts with these basic principles of partnership tax law. According to his argument, a new partnership does not come into existence until the day following the technical termination irrespective of the date on which the new partnership begins to realize income or incur expenses. Under ordinary tax principles, New Shoals was in existence on December 28 because it conducted business on that date. Respondent has not provided sufficient reasons for the ambiguous phrase "immediately thereafter" to trump the ordinary principles of tax law especially under the circumstances of a tax fiction of a terminated partnership and deemed formation of a new partnership.

Respondent's position distorts the allocation of the easement deduction away from the partners that incurred the expense. It is a basic axiom of tax law that income is taxable to the person who earns it, and an expense is deductible only by the person who incurs it. *Commissioner v. Culbertson*, 337 U.S. 733, 739–40 (1949). "[T]he taxpayer who sustained the loss is the one to whom the deduction shall be allowed." *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440–41 (1934). To this end, partners are required to report their distributive shares of partnership items for the period in which they are partners. The

---

[23] State law controls the determination of a taxpayer's property rights, and federal law determines the tax consequences of those property rights. *See United States v. Nat'l Bank of Commerce*, 472 U.S. 713, 722 (1985). Therefore, Georgia law governs when the easement donation is complete. *See Zarlengo v. Commissioner*, T.C. Memo. 2014-161, at *20–21. Under Georgia law Shoals's easement donation was effective on the date that the deed was recorded, December 28. *See* Ga. Code Ann. § 44-10-3 (2013); *see also Satullo v. Commissioner*, T.C. Memo. 1993-614, *aff'd*, 67 F.3d 314 (11th Cir. 1995) (unpublished table decision).

**[\*25]** determination of each partner's distributive share must have substantial economic effect. § 704(b)(2). The transferor of a partnership interest must report its share of pre-transfer partnership profits and losses, and the transferee must report its share of post-transfer partnership profits and losses. *Marriott v. Commissioner*, 73 T.C. 1129, 1139 (1980); *Moore*, 70 T.C. at 1032. Respondent's position would result in the inappropriate shifting of the easement deduction in accordance with the pre-sale membership interests, i.e., River Club would receive 95% of the deduction even though it received $515,000 for a 92% interest and held only a 3% membership interest. The members of Old Shoals are not entitled to the easement deduction; River Club did not incur 95% of the expense of the easement donation. Under basic principles of tax law, it is the members of New Shoals that are entitled to the deduction.[24] *See* § 702(a) (requiring partners to take into account their distributive shares of partnership items).

Nothing in the Code or the regulations precludes a partnership that is deemed to form immediately after a technical termination from using the date of the technical termination as the start date of its taxable year. River Club transferred a 92% interest in Shoals and Old Shoals terminated before 12:05 p.m., and afterwards New Shoals donated the easement. Accordingly, we find that New Shoals donated the easement within its taxable year ending December 31.

II.     *Substantiation Requirements*

Respondent argues that New Shoals is not entitled to the easement deduction because it failed to satisfy the heightened substantiation requirements applicable to noncash charitable deductions. Specifically, he argues that New Shoals did not attach a qualified appraisal and a properly completed Form 8283 to its return.

   A.     *Qualified Appraisal*

A qualified appraisal is conducted by a qualified appraiser in accordance with generally accepted appraisal standards and in compliance with regulatory requirements. § 170(f)(11)(E)(i). The Code defines a qualified appraiser as an individual who (1) has "earned an appraisal designation from a recognized professional appraiser

_____

[24] A partner's distributive share is generally determined by the partnership agreement unless the agreement's allocation does not have substantial economic effect. § 704(a) and (b). "In all cases, all partnership items for each taxable year must be allocated among the partners . . . ." Treas. Reg. § 1.706-4(a)(2).

**[*26]** organization or has otherwise met minimum education and experience requirements set forth in regulations prescribed by the Secretary," (2) regularly performs appraisals for compensation, and (3) meets other requirements in the regulations. *Id.* cl. (ii). The appraiser also must demonstrate "verifiable education and experience in valuing the type of property subject to the appraisal." *Id.* cl. (iii)(I).

Treasury Regulation § 1.170A-13 provides requirements for a qualified appraisal and a qualified appraiser for the taxable year at issue. The Secretary promulgated new regulations in Treasury Regulation § 1.170A-17 that redefine both terms and are applicable to contributions made on or after January 1, 2019. Taxpayers may rely on Treasury Regulation § 1.170A-17(c) for returns filed after August 17, 2006. Petitioner relies on part of this section addressing the appraisal's required statement of the appraiser's qualifications. However, respondent improperly cites parts of this section.

### 1.    *Definition of a Qualified Appraisal*

Under Treasury Regulation § 1.170A-13(c)(3)(ii), a qualified appraisal must include the following 11 items of information: (1) a description of the donated property in sufficient detail for a person who is not generally familiar with the type of property to ascertain that the property being appraised is the property that was donated; (2) if the property is tangible, the physical condition of the property; (3) the date (or expected date) of the donation; (4) the terms of any agreement or understanding entered into by the donor or donee, or on their behalf, relating to the use, sale, or other disposition of the property; (5) the appraiser's name, address, and identifying number; (6) the appraiser's qualifications including his background, experience, education, and memberships in professional appraisal associations; (7) a statement that the appraisal was prepared for income tax purposes; (8) the date of the appraisal; (9) the property's appraised fair market value on the donation date; (10) the method used to determine the fair market value, and (11) the specific basis for the valuation, such as the specific comparable sales or statistical sampling, including a justification for using sampling and an explanation of the sampling procedure employed.

Of these 11 items, respondent seems to identify 4 items as missing from the Foster appraisal: item (1), a sufficiently detailed description of the property; item (3), the date of the easement's donation; item (4),

**[\*27]** agreements relating to the disposition of the donated property; and item (6), Mr. Foster's education and experience.[25]

### 2.    *Substantial Compliance*

Before we examine whether the Foster appraisal met the requirements of a qualified appraisal, we note that substantial compliance with the regulatory requirements is sufficient for an appraisal to be qualified. *Bond v. Commissioner*, 100 T.C. 32, 42 (1993). The 11 regulatory requirements are "directory" rather than "mandatory" as they "do not relate to the substance or essence of whether or not a charitable contribution was actually made." *Id.* at 41. Accordingly, literal compliance is not required. *Id.* Substantial compliance is sufficient to satisfy the purpose of requiring appraisals, i.e., "to provide the IRS with information sufficient to evaluate claimed deductions and assist it in detecting overvaluations of donated property." *Costello v. Commissioner*, T.C. Memo. 2015-87, at \*17*; see also RERI Holdings I, LLC v. Commissioner*, 149 T.C. 1, 16–17 (2017), *aff'd sub nom. Blau v. Commissioner*, 924 F.3d 1261 (D.C. Cir. 2019). If the appraisal discloses sufficient information for the IRS to evaluate its reliability and accuracy, we may deem the requirements satisfied by substantial compliance with them. *Bond*, 100 T.C. at 42.

Substantial compliance is shown where "the taxpayers had provided most of the information required" or made omissions "solely through inadvertence." *Hewitt v. Commissioner*, 109 T.C. 258, 265 & n.10 (1997), *aff'd*, 166 F.3d 332 (4th Cir. 1998). Minor or technical defects will not prevent an appraisal from being qualified, but substantial compliance does not excuse taxpayers from the requirement that they disclose information that goes to the "essential requirements of the governing statute." *Estate of Clause v. Commissioner*, 122 T.C. 115, 122 (2004). We generally decline to apply substantial compliance where an appraisal either fails to meet multiple substantive

---

[25] Respondent criticizes the Foster appraisal on the basis of the definitions in Treasury Regulation § 1.170A-17. We have attempted to match his arguments with respect to that section with the 11 items listed in Treasury Regulation § 1.170A-13 that are applicable for the taxable year at issue. Some of his arguments do not easily correspond with those 11 items. For example, he argues that the Foster appraisal does not satisfy the substance and principles of the Uniform Standards of Professional Appraisal Practice (USPAP) and cites multiple USPAP Standards Rules. *See* Treas. Reg. § 1.170A-17(a)(2). However, Treasury Regulation § 1.170A-13 does not require an appraisal to satisfy the USPAP, and we do not need to address the USPAP Standards Rules except to the extent we find them relevant to the 11 items required by Treasury Regulation § 1.170A-13.

**[\*28]** requirements in the regulations or omits entire categories of required information. *See Lord v. Commissioner*, T.C. Memo. 2010-196, slip op. at 5 (holding that the taxpayer did not substantially comply where the appraisal omitted the donation date, the date of the appraisal, and the fair market value of the donated property); *Friedman v. Commissioner*, T.C. Memo. 2010-45 (holding that the taxpayer did not substantially comply where the appraisal omitted an adequate description of the donated property, a description of the property's condition, the valuation method used, the manner in which the property was acquired, and the property's cost basis). The substantial compliance doctrine "should not be liberally applied." *Alli v. Commissioner*, T.C. Memo. 2014-15, at \*54.

### 3.     *Substantiation Requirements*

We must determine whether the Foster appraisal provided sufficient information for the IRS to evaluate the easement deduction. *See Smith v. Commissioner*, T.C. Memo. 2007-368, slip op. at 47, *aff'd*, 364 F. App'x 317 (9th Cir. 2009). Respondent's arguments raise concern with respect to four items required under Treasury Regulation § 1.170A-13.

### a.     *Description of the Donated Property*

A qualified appraisal must adequately describe the donated property. Treas. Reg. § 1.170A-13(c)(3)(ii)(A). Respondent argues that the Foster appraisal valued the wrong asset. He argues that Mr. Foster valued the easement property's subsurface materials, not the easement. An appraisal of the wrong asset prevents the IRS from properly understanding and evaluating the claimed contribution. *Estate of Evenchik v. Commissioner*, T.C. Memo. 2013-34, at \*12–13. Such a mistake can result in the appraisal's not being in substantial compliance with the regulations. *Id.*

We find that the Foster appraisal correctly indicated that it is an appraisal of a conservation easement. In his report Mr. Foster repeatedly stated that he was valuing a conservation easement. He clearly stated that he was using a before and after valuation method and that he analyzed the value of the aggregate to determine the before value. There is no reasonable basis for the IRS to claim that it was confused about what property rights New Shoals donated or Mr. Foster valued. *See Dunlap v. Commissioner*, T.C. Memo. 2012-126, slip op. at 84. Accordingly, we find that Mr. Foster valued the correct property

**[*29]** and that the Foster appraisal includes a sufficient description of the donated property for a person who is not generally familiar with easements to ascertain that the correct property is being appraised.

b. *Date of Donation*

A qualified appraisal must include the date or expected date of the donation. Treas. Reg. § 1.170A-13(c)(3)(ii)(C). Disclosure of the date of the donation enables the IRS to determine whether the appraisal was timely performed. It also enables the IRS to "compare the appraisal and contribution dates for purposes of isolating fluctuations in the property's fair market value between those dates." *Rothman v. Commissioner*, T.C. Memo. 2012-163, slip op. at 36, *supplemented and vacated on other grounds*, T.C. Memo. 2012-218. Stating the wrong donation date or omitting it is a significant error and weighs against substantial compliance. *See, e.g.*, *Estate of Hoensheid v. Commissioner*, T.C. Memo. 2023-34, at *43; *Presley v. Commissioner*, T.C. Memo. 2018-171, at *78, *aff'd*, 790 F. App'x 914 (10th Cir. 2019); *Costello*, T.C. Memo. 2015-87, at *24–25; *Alli*, T.C. Memo. 2014-15, at *24.

The Foster appraisal does not state the date of the donation. However, New Shoals attached Form 8283, SERLC's acknowledgment letter, and the easement deed to its return, which all provide the donation date. Accordingly, the IRS was not significantly affected by the Foster appraisal's failure to include the date of the easement grant. Accordingly, we find that omission of the donation date does not prevent a finding that the Foster appraisal substantially complied with the qualified appraisal requirements. *See Zarlengo*, T.C. Memo. 2014-161, at *36 (finding that taxpayers substantially complied by disclosing donation date on appraisal summary); *Simmons v. Commissioner*, T.C. Memo. 2009-208, slip op. at 17–18 (same), *aff'd*, 646 F.3d 6 (D.C. Cir. 2011).

c. *Agreements Relating to the Donated Property*

A qualified appraisal must include the terms of any agreements entered into by the donor or donee that relate to the use, sale, or disposition of the donated property. Treas. Reg. § 1.170A-13(c)(3)(ii)(D). Information concerning such agreements is necessary to enable the IRS to evaluate whether the donor received a quid pro quo in exchange for the donation. *Costello*, T.C. Memo. 2015-87, at *19; *Alli*, T.C. Memo. 2014-15, at *26.

[*30] Respondent identifies two potential issues with respect to this requirement. He argues that the Foster appraisal does not state that the deed limits SERLC's right to transfer the easement only to other charitable organizations. We find that this omission is minor and would not preclude the IRS from evaluating the reliability of the appraisal. The Foster appraisal clearly states that New Shoals donated a conservation easement in perpetuity, and New Shoals attached the easement deed to its return. The IRS was made aware that New Shoals was claiming an easement contribution deduction and had the necessary information to ascertain whether the deed imposed the required restrictions on SERLC's right to transfer the easement.

Respondent also argues that the appraisal's description of the deed's use restrictions is vague. We find that the Foster appraisal adequately describes the permitted and prohibited uses of the easement property after the easement's grant.[26] Notably, while respondent raises this issue with the appraisal, he has not challenged New Shoals's easement contribution deduction on the grounds that it failed to meet statutory or regulatory requirements for use restrictions or that Shoals received a quid pro quo for the donation. We find that the Foster appraisal provided sufficient information for the IRS to determine whether Shoals overvalued the easement.

d.      *Mr. Foster's Qualifications*

A qualified appraisal must state the appraiser's qualifications including his background, experience, education, and memberships in professional appraisal associations. Treas. Reg. § 1.170A-13(c)(3)(i)(B), (ii)(F); *see also id.* subpara. (5)(i). Inclusion of the appraiser's qualifications in an appraisal allows the IRS to evaluate whether the appraisal is reliable. *Estate of Hoensheid*, T.C. Memo. 2023-34, at *41; *Alli*, T.C. Memo. 2014-15, at *35.

As stated above, the Code provides the following requirements for a qualified appraiser's education and experience: an appraiser must (1) have earned an appraisal designation from a recognized professional appraiser organization or otherwise met minimum education and

---

[26] The Foster appraisal contains inconsistent statements about whether Mr. Foster received a copy of a draft of the easement deed. Respondent did not question Mr. Foster about this discrepancy at trial. In the light of the detailed description of the deed in his appraisal, we find that Mr. Foster reviewed the draft deed and the statement in his appraisal to the contrary is a clerical error that does not affect whether the appraisal is a qualified appraisal.

**[\*31]** experience requirements set forth in the regulations, (2) demonstrate verifiable education and experience in valuing the specific type of property subject to the appraisal, and (3) regularly perform appraisals for compensation. § 170(f)(11)(E)(ii)(I) and (II), (iii)(I). The Foster appraisal states that Mr. Foster has done all three. It is clear that Mr. Foster is a qualified appraiser, and respondent has not argued otherwise. *See Estate of Hoensheid*, T.C. Memo. 2023-34, at \*13, \*42 (holding that the appraiser was not a qualified appraiser and addressing the appraisal's failure to state his qualifications). Rather, respondent argues that the Foster appraisal failed to include his qualifications.

The appraisal states that Mr. Foster's qualifications are provided in the addenda, but the appraisal omitted the addenda. Despite this oversight, we find that the Foster appraisal provided sufficient information about his qualifications to allow the IRS to evaluate the appraisal's reliability. It states that Mr. Foster is licensed and certified to appraise conservation easements by the Licensing and Regulation Real Estate Appraisers Board of the Georgia Department of Labor and is a member of the Appraisal Institute (AI). His membership is identified with the acronym MAI. MAI membership requires a four-year bachelor's degree, a passing grade on AI's exam, and a minimum of 4,500 hours of specialized work. *See* www.appraisalinstitute.org/ai-grs-designation-requirements (last visited Mar. 20, 2024) (providing MAI designation requirements). The appraisal further states that Mr. Foster has completed AI's continuing education requirements. Mr. Foster's membership in AI ensures he was a qualified appraiser, and the inclusion of MAI after his name sufficiently demonstrates his education and experience in valuing conservation easements.

The definition of education and experience in Treasury Regulation § 1.170A-17, which petitioner is entitled to rely on for the year at issue, supports our finding that the Foster appraisal provides sufficient information about his qualifications to allow the IRS to evaluate whether his appraisal is reliable. That section requires the appraisal to state the appraiser's qualifications to value the type of property being valued, including his education and experience. Treas. Reg. § 1.170A-17(a)(3)(iv)(B). Under that section, education and experience are verifiable if the appraiser specifies his education and experience and makes a declaration that he is qualified to make appraisals because of his education and experience. *Id.* para. (b)(4); *see also id.* para. (b)(1) (defining a qualified appraiser as an individual with verifiable education and experience in valuing the type of property for

**[\*32]** which the appraisal is performed). An appraiser is treated as having education and experience either through coursework or a recognized appraiser designation. *Id.* para. (b)(2)(i); *see also id.* subdiv. (iii) (defining a recognized appraiser designation as a designation awarded by a generally recognized professional appraiser organization on the basis of demonstrated competency).

The Foster appraisal clearly states that Mr. Foster holds a recognized appraiser designation with the acronym MAI. An MAI designation means that he has the education and experience to perform a valuation, as membership requires education, testing, and experience. Thus, we find that the Foster appraisal substantially complied with the statutory and regulatory requirements for stating Mr. Foster's qualifications. *See Bond*, 100 T.C. at 41 (holding that the taxpayer substantially complied with the reporting requirements even though it failed to provide the appraiser's qualifications); *see also Cave Buttes, L.L.C.*, 147 T.C. at 349–50 (holding that an appraisal substantially complied where it omitted qualifications on one co-appraiser).

### 4.    *Conclusion*

Although the Foster appraisal does not strictly comply with the qualified appraisal requirements, we find that it provided sufficient information for the IRS to evaluate it. Accordingly, we hold that New Shoals substantially complied with the reporting requirements for a qualified appraisal.

### B.    *Appraisal Summary*

Taxpayers must attach appraisal summaries to their returns claiming noncash charitable contributions greater than $5,000.[27] *See* Treas. Reg. § 1.170A-13(c)(2)(i)(B). To be fully completed, an appraisal summary must include the date the donor acquired the property, the

---

[27] In the Deficit Reduction Act of 1984, Pub. L. No. 98-369, § 155(a)(1) and (2), 98 Stat. 494, 691 (an uncodified statutory provision), Congress directed the Secretary to issue regulations under section 170(a)(1) imposing heightened substantiation requirements for noncash charitable contribution deductions greater than $5,000 that require taxpayers to obtain a qualified appraisal, attach an appraisal summary to their returns, and include the property's cost basis and acquisition date. In response, the Secretary added subparagraph (2) to Treasury Regulation § 1.170A-13(c). In the American Jobs Creation Act of 2004, Pub. L. No. 108-357, § 883(a), 118 Stat. 1418, 1631, Congress amended section 170(f) to require taxpayers also to obtain a qualified appraisal of the donated property and attach it to their returns along with any other information that the Secretary requires. *See* § 170(f)(11)(C).

**[\*33]** manner of acquisition, the donor's cost or other basis in the property, the date of the donation, and the appraised fair market value of the donated property. *Id.* subpara. (4)(ii)(D), (E), (G), (J). The qualified appraiser and the donee must sign the appraisal summary. *Id.* subpara. (4)(i)(C), (iii). The IRS has prescribed Form 8283 for the appraisal summary. *Jorgenson v. Commissioner*, T.C. Memo. 2000-38, slip op. at 21. Failure to comply with the appraisal summary requirements results in disallowance of the deduction. *See* § 170(f)(11)(A).

Congress enacted the heightened reporting requirements "to give the IRS tools that would enable it to identify inflated charitable contribution deductions." *Belair Woods, LLC v. Commissioner*, T.C. Memo. 2018-159, at \*16; *see also Brooks v. Commissioner*, T.C. Memo. 2022-122, at \*17 (explaining that Congress "specifically" enacted the heightened substantiation requirements "to prevent the Commissioner from having to sleuth through the footnotes of millions of returns"). The purpose of requiring taxpayers to report cost basis, fair market value, and the amount of the deduction on an appraisal summary is "to alert the Commissioner, in advance of audit, of potential overvaluations of contributed property and thereby deter taxpayers from claiming excessive deductions in the hope that they would not be audited." *RERI Holdings I, LLC*, 149 T.C. at 16–17 (involving the taxpayer's failure to disclose its cost or adjusted basis in the donated property). "Revenue agents cannot be required to sift through dozens or hundreds of pages of complex returns looking for clues about what the taxpayer's cost basis might be." *Belair Woods, LLC*, T.C. Memo. 2018-159, at \*20.

Respondent argues that New Shoals did not satisfy the regulatory requirements for an appraisal summary because it attached two Forms 8283 to its return that reported inconsistent information. Only pages 2 of the two versions differed. Ms. Salvati credibly testified that Gross Collins encountered problems with its return preparation software when it submitted the signed Form 8283 as a pdf attachment to New Shoals's return. Accordingly, Gross Collins prepared a computer-generated Form 8283. In an unexplained oversight, it entered incorrect information for New Shoals's adjusted basis in the donated property, the manner of the property's acquisition, the donated property's appraised value, and the amount of the deduction. Regardless of which version the IRS reviewed, it would have been clear to the IRS that New Shoals potentially overvalued the easement. The Gross Collins Form 8283 reported a basis of $37,776 and a deduction of over $22.2 million, and the Baker Donselson Form 8283 reported a basis of $1.5 million and a

**[\*34]** deduction of $23 million.[28] Accordingly, we do not face the same concerns that we did in *Belair Woods* or *Brooks* where the taxpayers failed to disclose and overstated their bases, respectively.

Both Forms 8283 should have alerted the IRS to a potential overvaluation of the easement's fair market value. *See Oakhill Woods, LLC v. Commissioner*, T.C. Memo. 2020-24, at \*12–15 (involving an appraisal summary that did not provide the taxpayer's basis); *Loube v. Commissioner*, T.C. Memo. 2020-3, at \*8–9 (involving an appraisal summary that did not provide the date on which the donated property was acquired, the cost or adjusted basis, or the appraiser's or the donee's signature). New Shoals did not hide pertinent information. Gross Collins should have been more careful to confirm that it included the correct information on the computer-generated Form 8283. However, such carelessness does not render Form 8283 inadequate to satisfy the substantiation requirements for an appraisal summary. Under the facts and circumstances of this case, we find that Shoals satisfied the statutory and regulatory requirements of an appraisal summary. We find that the careless clerical errors on the Gross Collins Form 8283 are harmless. The misstatements of the cost basis, the fair market value, and the amount of the deduction do not rise to the level of the omissions and overstatements that we have addressed in our prior caselaw.

III.    *Valuation*

  A.    *Valuation Principles*

Shoals is entitled to a charitable contribution deduction for the easement donation. The amount of a charitable contribution deduction for a donation of property is generally equal to the fair market value of the donated property on the donation date. Treas. Reg. § 1.170A-1(a), (c)(1). The regulations define fair market value as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." *Id.* para. (c)(2). Valuation is not a precise science, and the value of property on a given date is a question

---

[28] The appraiser and the donee must sign the appraisal summary. Treas. Reg. § 1.170A-13(c)(4)(i)(B) and (C). Mr. Foster and Mr. Wright signed only the Baker Donelson Form 8283. In addition, both versions refer to an attachment for additional information, but there is only one attachment, and it is consistent with the Baker Donelson Form.

**[\*35]** of fact to be resolved on the basis of the entire record. *See Kaplan v. Commissioner*, 43 T.C. 663, 665 (1965).

The parties retained experts to testify about the value of the easement. We evaluate experts' opinions in the light of their qualifications and the evidence in the record. *See Parker v. Commissioner*, 86 T.C. 547, 561 (1986). When experts offer competing opinions about fair market value, we decide how to weight the opinions by examining the factors that the experts considered in reaching their conclusions. *See Casey v. Commissioner*, 38 T.C. 357, 381 (1962). We are not bound by an expert opinion and may accept it in its entirety or accept it in part in the exercise of our sound judgment. *Helvering v. Nat'l Grocery Co.*, 304 U.S. 282, 294–95 (1938); *Estate of Newhouse v. Commissioner*, 94 T.C. 193, 217 (1990); *Laureys v. Commissioner*, 92 T.C. 101, 127 (1989). We may determine fair market value on the basis of our own examination of the evidence in the record. *Emanouil v. Commissioner*, T.C. Memo. 2020-120, at \*50–51 (citing *Silverman v. Commissioner*, 538 F.2d 927, 933 (2d Cir. 1976), *aff'g* T.C. Memo. 1974-285).

The parties agree that we should value the easement using the before and after valuation method, which values the easement by calculating the difference between the fair market value of the easement property unencumbered by the easement and its fair market value after the easement's grant.[29] *See* Treas. Reg. § 1.170A-14(h)(3)(i). We have used this method to value conservation easements. *See, e.g.*, *Browning v. Commissioner*, 109 T.C. 303, 315, 320–24 (1997); *Hilborn v. Commissioner*, 85 T.C. 677, 688–89 (1985). However, the parties' experts used two different approaches to determine the before value. Respondent's expert Mr. Brigden used the comparable sales method, and petitioner's experts Mr. Gold and Mr. Kenny used an income approach, the discounted cashflow method. Determining which method to apply is a question of law. *See Chapman Glen Ltd. v. Commissioner*, 140 T.C. 294, 325–26 (2013).

The comparable sales method is "generally the most reliable method" for valuing vacant, unimproved land. *Estate of Rabe v. Commissioner*, T.C. Memo. 1975-26, *aff'd*, 566 F.2d 1183 (9th Cir. 1977) (unpublished table decision); *see also United States v. 320.0 Acres of*

---

[29] When using the before and after valuation method, any enhancement in the value of a donor's other property resulting from the easement reduces the value of the charitable contribution. Treas. Reg. § 1.170A-14(h)(3)(i). Shoals did not own property whose value was enhanced by the easement.

**[\*36]** *Land, More or Less in the Cty. of Monroe*, 605 F.2d 762, 798 (5th Cir. 1979) ("Courts have consistently recognized that, in general, comparable sales constitute the best evidence of market value."); *Estate of Giovacchini v. Commissioner*, T.C. Memo. 2013-27; *Talkington v. Commissioner*, T.C. Memo. 1998-412. On occasion, we have used the income approach to value unencumbered, vacant land. *See, e.g.*, *Chapman Glen Ltd.*, 140 T.C. at 325; *Crimi v. Commissioner*, T.C. Memo. 2013-51, at \*64–65.

The comparable sales method values property by comparing it to similar properties sold in arm's-length transactions around the valuation date. *See Estate of Spruill v. Commissioner*, 88 T.C. 1197, 1229 n.24 (1987); *Wolfsen Land & Cattle Co. v. Commissioner*, 72 T.C. 1, 19 (1979). Because no two properties are ever identical, the appraiser must adjust the sale prices of the comparables to account for differences between the properties (e.g., parcel size, location, and physical features) and the terms of the sales (e.g., proximity to valuation date and conditions of sale). *Wolfsen Land & Cattle Co.*, 72 T.C. at 19. The reliability of a comparable sales analysis depends on the comparability of the properties selected as comparables and the reasonableness of the adjustments made to the prices to establish comparability. *Id.* at 19–20.

The income method values a property by computing the present value of projected future income from the property. *See, e.g.*, *Chapman Glen Ltd.*, 140 T.C. at 327; *Marine v. Commissioner*, 92 T.C. 958, 983 (1989), *aff'd*, 921 F.2d 280 (9th Cir. 1991) (unpublished table decision); *Crimi*, T.C. Memo. 2013-51, at \*64. The theory behind an income approach is that an investor would be willing to pay no more than the present value of a property's anticipated future net income. *See Trout Ranch, LLC v. Commissioner*, T.C. Memo. 2010-283, *aff'd*, 493 F. App'x 944 (10th Cir. 2012). Income valuation methods are not favored when valuing vacant land with no income-producing history because they are inherently speculative and unreliable. *See, e.g.*, *Chapman Glen Ltd.*, 140 T.C. at 327; *Whitehouse Hotel Ltd. P'ship v. Commissioner*, 139 T.C. 304, 324–25 (2012), *aff'd in part, vacated and remanded in part*, 755 F.3d 236 (5th Cir. 2014); *Marine*, 92 T.C. at 983; *Ambassador Apartments, Inc. v. Commissioner*, 50 T.C. 236, 243–44 (1968), *aff'd per curiam*, 406 F.2d 288 (2d Cir. 1969); *Crimi*, T.C. Memo. 2013-51, at \*66–67.

B.    *Highest and Best Use*

We determine property value on the basis of the property's highest and best use. *See Stanley Works & Subs. v. Commissioner*,

**[\*37]** 87 T.C. 389, 400 (1986); Treas. Reg. § 1.170A-14(h)(3)(i) and (ii). Accordingly, before we determine the before value, we must first determine the unencumbered property's highest and best use. Petitioner argues that the highest and best use was as an aggregate quarry; respondent argues that it was low-density residential and recreational uses. A property's highest and best use is the most profitable use for which it is adaptable and needed or likely to be needed in the reasonably near future. *Olson v. United States*, 292 U.S. 246, 255 (1934); *Symington v. Commissioner*, 87 T.C. 892, 897 (1986). It can be any realistic, objective, potential use of the property. *Symington*, 87 T.C. at 896–97; *Hilborn*, 85 T.C. at 689. If the proposed highest and best use is different from the property's current use, the proposed use requires "closeness in time" and "reasonable probability." *Hilborn*, 85 T.C. at 689. Highest and best use is a question of fact and requires an objective assessment of the likelihood that the property would have been put to such use absent the easement. *Stanley Works & Subs.*, 87 T.C. at 408. Highest and best use must be "reasonably probable," "legal," "physically possible," and "financially feasible." *See Whitehouse Hotel Ltd. P'ship*, 139 T.C. at 331 (quoting Appraisal Institute, *The Appraisal of Real Estate* 277–78 (13th ed. 2008)). The parties primarily disagree over the last element, whether a quarry was financially feasible.

The parties presented expert testimony on the highest and best use of the unencumbered easement property. Respondent's expert Mr. Brigden determined the highest and best use was low-density residential and agricultural by analyzing the aggregate market and land use patterns in Hart County. Petitioner's experts Mr. Kenny and Dr. Capps determined that a quarry was the highest and best use using a discounted cashflow analysis of a proposed quarry to evaluate whether aggregate could have been economically mined. Respondent's expert Mr. Gunesch performed a discounted cashflow analysis in rebuttal and concluded that the proposed quarry was not financially feasible.

1. *Market Analysis*

Mr. Brigden analyzed highest and best use in large part on the land use in the area surrounding the easement property. He testified that aggregate is abundant in the area.[30] He analyzed the predominant land uses in the area, which he found were recreational, rural residential, and agricultural. He concluded from land use patterns that there was not a demand for mining-use properties. He opined that

---

[30] Mr. Kenny acknowledged that aggregate is abundant in the region.

**[*38]** because aggregate is abundant, the easement property is not unique and this lack of uniqueness made the discounted cashflow analysis an inappropriate method to value the easement property. He further opined that the easement property did not have a comparative advantage as a quarry over other land with known aggregate deposits.

We agree with Mr. Brigden's well-reasoned opinion and find that the highest and best use of the unencumbered easement property was low-density residential and recreational uses. It was not reasonably probable that the easement property would have been needed as a quarry in the reasonably near future. Furthermore, we find significant flaws in the discounted cashflow analyses performed by petitioner's experts, and the quarry was not financially feasible.

### 2. *Discounted Cashflow Analysis*

Petitioner's experts performed discounted cashflow analyses in which they concluded that a proposed quarry could have produced aggregate over 25 to 30 years with a net present value ranging from $21.1 to $27.6 million. Respondent's expert Mr. Gunesch determined a net present value of $2.9 million. The parties argue at length about errors in the opposing party's experts' discounted cashflow analyses including errors with respect to production and sales projections, the amount of overburden that would need to be removed and the costs to remove and store it, the time required to obtain mining permits and its impact on production and sales in the first year of the proposed quarry, the quality of the aggregate, operating costs, and capital costs.

It is unnecessary for us to examine these arguments in detail because we find that petitioner's experts severely overestimated demand for aggregate and failed to account for existing supply in the market. Accordingly, we find that their production and sales projections far exceeded likely production and sales. Petitioner's experts failed to account for the fact that competing quarries had substantial delivered price advantages over the proposed quarry because of their locations. As a result, petitioner's experts' production and sales projections were overly optimistic. We find that it is highly unlikely that the market would have supported their profitability conclusions. We find that a proposed quarry was not financially feasible.

### a. *Demand for Aggregate*

We begin by considering the size of the market for aggregate. Both parties' experts testified that generally the market for aggregate is

**[*39]** limited to an area within a 50-mile radius of a quarry because of the costs of transporting it to the point of use.[31] Mr. Brigden testified that most aggregate is purchased from quarries within 25 miles of the point of use because of transportation costs. Both parties' experts agreed that demand for aggregate from a quarry depends on its proximity to customers. Dr. Capps testified that "demand is directly proportional to the existing population base and rate of population growth" and "[t]he crushed stone industry is highly dependent on construction activity." Mr. Kenny testified that "demand for aggregate material is driven by population growth, business growth, and housing growth."

Petitioner's experts testified that there was adequate demand to support the proposed quarry. Respondent's expert Mr. Gunesch testified to the opposite. We find Mr. Gunesch's testimony more convincing. We find that the market would have likely been limited to an area within a 25-mile radius of the proposed quarry. The market likely would not have supported petitioner's experts' sales projections. The area surrounding the easement property is primarily rural. Hart County had a small population and had minimal growth during the relevant period. Mr. Gold identified the main target markets for the proposed quarry as rural areas, nearby small towns, and the edges of the larger metro areas, mainly Greenville. Mr. Kenny testified that "the primary population epicenter[s]" are Greenville and Augusta. However, the Greenville metro area, which includes part of Anderson County, is approximately 50 miles away and Augusta is nearly 100 miles away. Dr. Capps erroneously included northeastern Atlanta in his defined market for the proposed quarry even though Atlanta is over 100 miles from the easement property.

Mr. Gold and Dr. Capps estimated annual market demand at 7.2 and 8 million tons, respectively. Both used population figures to estimate demand. Mr. Gold calculated that the population within a 25-mile and a 50-mile-radius market was 217,000 and 1 million, respectively, and estimated that the proposed quarry would have captured 20% of the 25-mile-radius market and 5% of the 50-mile-radius market. Using the per-person statewide demand for aggregate in Georgia and South Carolina, he calculated that the proposed quarry's 50-mile-radius market would have sold nearly 660,000 tons per year,

---

[31] Some existing quarries had access to rail lines to transport aggregate, which allows them to expand their market beyond a 50-mile radius.

**[\*40]** i.e., approximately 300,000 tons in the 25-mile-radius market and 360,000 tons in the 50-mile-radius market.[32]

We doubt that the proposed quarry could have sold that much aggregate in either market. Mr. Gold based his demand calculations on statewide aggregate demand even though he agreed that the aggregate market is generally limited to an area within a 50-mile radius. There is no concrete data in the record on the demand within the 50-mile-radius market or evidence that demand is uniform statewide. It seems likely that demand is not uniform especially in the light of the fact that demand is greater near population centers. The proposed quarry is in a rural area, and the closest cities with populations over 100,000 and 1 million are both 50 miles away and have closer available aggregate sources. Mr. Gold's statewide demand figures, 5.65 and 7.38 tons per person for Georgia and South Carolina, respectively, are significantly higher than nationwide demand of 4.5 tons per person.[33] Mr. Gold did not establish to our satisfaction that the proposed quarry's market would match statewide per-person demand especially in the light of the fact that the 25-mile-radius market was primarily rural. Moreover, we are not convinced that the proposed quarry would have sold 360,000 tons in the 50-mile radius market because quarries located closer to the population centers would have had significant delivered price advantages, as discussed further below.

Dr. Capps calculated the 8 million tons of annual demand on the basis of 1.8 million people living within the 50-mile-radius market, nearly twice the population that Mr. Gold used in his demand calculation.[34] We find Mr. Gold's population figures are more reliable. Using Mr. Gold's population figures and Dr. Capps's per-person demand, the annual demand within the 50-mile radius market would be less than 4.4 million tons. However, we find that the proposed quarry's market was likely limited to the area less than 25 miles from the proposed quarry. Both Dr. Capps and Mr. Gold failed to adequately account for the competitive delivered price advantage that competing quarries

---

[32] From 2013 to 2016 statewide demand for aggregate increased in Georgia and South Carolina by an average of 9% and 10% per year, respectively. Statewide prices also increased in both states by an average of over 5% each year during this period.

[33] Dr. Capps testified to nationwide demand. Mr. Gold estimated each state's per-person demand by dividing aggregate use in each state by its population. Mr. Kenny restated Mr. Gold's population figures in his report.

[34] It seems that Dr. Capps's population figures are based on the total population of nearby counties in Georgia and South Carolina and erroneously include population outside the 50-mile-radius market.

**[*41]** would have had over the proposed quarry because they are closer to population centers and the likely point of use. Only Mr. Gunesch adequately examined the effect that competing quarries would have had on the size of the proposed quarry's market. We find his testimony convincing.

### b. *Competition from Existing Quarries*

Mr. Gunesch testified that the proposed quarry's market area would have likely been much smaller than that within a 50-mile radius because existing quarries are closer to population centers. Both parties' experts identified at least 12 quarries within a 50-mile radius of the easement property.[35] Mr. Gunesch examined the location of competing quarries relative to the easement property and population centers to determine the size of the proposed quarry's market. He determined that a preferred market is limited to an area within 6 to 20 miles (depending on direction). He testified that transportation costs are the "most critical factor" for the viability of a quarry. Both Mr. Kenny and Dr. Capps agreed that "[s]tone is purchased from the closest available sources that can provide the quantity and quality necessary to match the customers' requirements." They testified that "[t]he cost of transportation is the strongest factor driving the choice of quarry" and "the quarry closest to existing project sites . . . will eventually acquire that business."[36] Mr. Gold conceded that many existing quarries are closer to the population centers than the easement property. He failed to account for the aggregate supply from existing quarries when estimating the proposed quarry's annual sales. In fact, none of petitioner's experts took into account competition from other quarries.[37]

There are two quarries in Anderson County and five in and around Greenville. These quarries would have easily outperformed the proposed quarry in delivered price.[38] Quarries closer to the Greenville metro area would have had a delivered price advantage of $6.75 per ton assuming transportation costs of 15 cents per mile per ton and those

---

[35] Some may have no longer been active.

[36] Both Mr. Kenny and Dr. Capps had these quoted statements in their reports.

[37] Green Creek purported to propose operating quarries in at least four other easement transactions that would have been in competition with the proposed quarry on the easement property.

[38] The city of Greenville and parts of Anderson County are 50 miles from the easement property.

**[*42]** quarries' being 45 miles closer to Greenville.[39] There are additional quarries outside of the Greenville metro area that are also closer to it than the easement property. Athens, a city with a population of approximately 250,000 that is approximately 50 miles from the easement property, also has multiple suppliers that are closer than the easement property.

Nor did petitioner present any evidence that demand was not being met. Dr. Capps opined that the proposed quarry could have sold aggregate to underserved projects within a 50-mile radius but did not identify any underserved projects. He made unsupported statements about the demand for aggregate and ignored key data. Conversely, Mr. Gunesch testified that a quarry near Anderson had a target production of 259,000 tons per year but produced only 135,000 to 145,000 tons annually, indicating that there was excess supply. This Anderson quarry's annual production was approximately 25% of Mr. Gold's and 35% of Mr. Kenny's and Dr. Capps's projected annual production for the proposed quarry.

We find Mr. Gunesch's opinion about the size of the proposed quarry's market the most credible. He identified a preferred market that encompassed the area where the proposed quarry would have been the closest source of aggregate. He estimated that the annual demand in the preferred market was 383,000 tons.[40] The proposed quarry would have had to capture 100% of the preferred market to get close to achieving Mr. Kenny's and Dr. Capps's 400,000-ton annual production estimates while Mr. Gold estimated annual demand to be even higher, 600,000 tons.

### 3. *Conclusion*

On the basis of the record, we find that petitioner's experts overestimated annual sales of aggregate from the proposed quarry and overstated its potential profitability. It is highly unlikely that the

---

[39] If we used the high end of Dr. Capps's costs, 25 cents, the delivered price advantage would have been $11.25 per ton. Mr. Gold testified that the national average cost was 22 cents.

[40] If we used Mr. Gold's population figure of 217,000 people living within a 25-mile radius to calculate demand, the annual demand would have been less than 1 million tons (assuming Dr. Capps's 4.5 per-person demand). The proposed quarry would have had to capture over 40% of the market to reach Dr. Capps's and Mr. Kenny's production estimates of 400,000 tons and over 60% to reach Mr. Gold's 600,0000-ton production estimate, which we find unlikely on the basis of the record before us.

**[\*43]** proposed quarry would have sold 400,000 to 600,000 tons of aggregate annually. We find that there is a substantial risk that production and sales estimates that petitioner's experts used in their discounted cashflow analyses would not be realized. Aggregate is abundant in the region. The closest metro area was approximately 50 miles away, and the easement property has a competitive price disadvantage over existing quarries that are closer to population centers. Petitioner's experts' production figures are unreasonable.[41] Accordingly, we conclude that an aggregate quarry was not financially feasible and that the highest and best use of the unencumbered easement property was low-density residential and recreational uses.

### C.   *Before Value of Easement Property*

Mr. Brigden determined a before value of $420,000 using the comparable sales method. Petitioner's experts determined before values of $21.1 to $27.6 million on the basis of the net present value of subsurface aggregate using discounted cashflow analyses. Petitioner's experts based their valuations on the wrong highest and best use. Accordingly, their analyses are not helpful to our valuation.

### 1.   *Comparable Sales Analysis*

Only Mr. Brigden presented an expert opinion as to the value of the unencumbered easement property for residential and recreational use. He determined a before value using the comparable sales method, which we commonly find the most reliable method for valuing vacant land. He performed a detailed analysis of sales of vacant land in Hart County before identifying his four comparables. He adjusted the comparables' sale prices to account for differences in physical characteristics, terms of sales, and sale dates. Petitioner did not object to the comparables or the price adjustments that Mr. Brigden made except to argue that the comparables were not mining-use properties. Petitioner did not ask Mr. Brigden a single question on cross-examination about the easement property's similarities to and differences from the comparables or about the price adjustments that he made. Nor did petitioner's experts criticize Mr. Brigden's comparables on these bases. The four comparables had adjusted prices ranging from

---

[41] Mr. Gunesch testified that a quarry operating in line with Mr. Gold's discounted cashflow analysis would have an operating profit margin of 67%. He testified that the average industry profit margin is 24%. He opined that Mr. Gold's analysis produced unrealistic profit margins and therefore an unrealistic net present value.

[*44] $3,198 to $4,626 per acre and average and median adjusted prices of $3,693 and $4,014 per acre, respectively. We find Mr. Brigden's valuation credible and reliable and place significant weight on the adjusted prices of the four comparables in reaching our valuation decision.

## 2. *River Club's Sale Price*

The $515,000 price that River Club received for its 92% membership interest in Shoals confirms the reasonableness of Mr. Brigden's valuation especially in the light of the fact that the easement property was Shoals's sole asset. *See TOT Prop. Holdings, LLC v. Commissioner*, 1 F.4th 1354 (11th Cir. 2021) (considering the sale price of LLC membership interests relevant in the valuation of real estate held as the LLC's primary asset), *aff'g* No. 5600-17 (T.C. Nov. 22, 2019) (bench opinion). River Club purchased the easement property in 2007 for $12,000 per acre as part of a failed residential development. In the decade since it stopped working on its real estate development, it received offers to purchase the River Club property for no more than $1.5 million, approximately $3,500 per acre. Ultimately, it contributed the property to three land LLCs associated with Green Creek in exchange for membership interests and then resold the membership interests for $2.1 million, approximately $5,000 per acre. It retained small percentages of the membership interests in the three land LLCs and received parts of three easement deductions. River Club transferred the easement property to Shoals in exchange for a 95% membership interest and resold a 92% interest for $515,000.

Mr. Koehn viewed the three easement transactions as a structured sale of the River Club property for $2.1 million. River Club's transfer of the easement property represents an arm's-length transfer for $5,000 per acre. None of petitioner's experts considered River Club's $5,000-per-acre transfer or even its 2017 purchase of the land for $12,000 per acre. The ownership and sales histories are clearly relevant to the valuation of the easement property. We agree with Mr. Brigden's testimony that $515,000 "appears to be generally reflective of fair market value pricing" for the easement property.

Petitioner does not challenge the arm's-length nature of River Club's transfer of the easement property to Shoals except to argue that River Club did not know the value of the subsurface aggregate. River Club's lack of knowledge does not explain away the substantial disparity between Shoals's claimed deduction and the $515,000 price. As Mr.

**[\*45]** Brigden explained and we discussed above, land with known aggregate deposits is abundant in the area and does not enjoy a price premium. We place considerable weight on the $515,000 that River Club received in the transaction in reaching our valuation decision.

### 3. *Mining-Use Valuation*

Even if we were to assume that the unencumbered easement property's highest and best use was as a quarry, the record would not support Shoals's claimed deduction. Significantly, none of petitioner's experts who testified at trial opined as to the fair market value of the unencumbered easement property. Rather, they determined the net present value of the subsurface aggregate and ignored the regulatory definition of fair market value. The regulations require us to determine fair market value on the basis of the price that a willing buyer and a willing seller would agree to. Petitioner did not present any evidence that a prospective buyer of mining-use property would pay the net present value of aggregate for the land. We are not convinced that a quarry operator would pay the aggregate's net present value for the land as there would be no means for a profit. Petitioner's experts do not tell us what a quarry operator would pay for the land.

Moreover, the record establishes that the presence of known aggregate deposits has a minimal effect on the price of the land in the region because aggregate is abundant.[42] At respondent's request, Mr. Brigden valued the unencumbered easement property assuming a quarry would have been its most likely use. He used the comparable sales method of valuation and determined a before value of $770,000, approximately $7,500 per acre. In his rebuttal report, he identified 14 mining-use comparables that ranged in appreciation-adjusted prices

---

[42] When Mr. Brigden prepared his initial report, he was aware of the subsurface testing on the easement property but did not ask about the results or receive any testing results. Rather, he determined that granite bedrock was abundant in the area on the basis of geological maps. Subsequently, he received information on the testing, and in his rebuttal report he identified areas in Georgia with known biotite gneiss on the basis of geological maps. At trial he testified that he understood that biotite gneiss and granitic gneiss are substitutes as construction materials. Mr. Kenny confirmed that gneiss and granite are similar and lumping them together is reasonable. He testified that there are biotite gneiss, granitic gneiss, and granite on the easement property. The Court questioned petitioner's counsel about evidence in the record about the difference between granitic gneiss and biotite gneiss, and petitioner's counsel did not identify anything in the record that establishes that there is a substantial difference between them for purposes of this case.

[*46] from $1,645 to $29,157 per acre.[43] The $29,157-per-acre comparable was purchased to expand an existing quarry in an area with ready access to transportation and a high demand for industrial-use land. The next highest priced comparable sold for significantly less, $12,256 per acre. He determined average and median appreciation-adjusted prices of $8,532 and $7,392 per acre, respectively. Significantly, the prices paid for land purchased for new extraction ranged from $1,645 to $7,570 per acre. Mr. Brigden opined that there were negligible differences (approximately 1.5%) in prices paid for land with known deposits from 2014 to 2017. He explained that there is no price premium for land with known aggregate deposits because aggregate is abundant. He testified that the easement property is not unique and that he would consider property to be unique if the market demonstrated a preference for the property.

Mr. Brigden also criticized petitioner's experts' use of the discounted cashflow analysis. He opined that such an analysis is inappropriate because market participants would not perform one when deciding whether to purchase land for aggregate mining.[44] He testified that market participants did not need to perform a discounted cashflow analysis because aggregate is abundant. He also opined that market participants would not test mineral deposits before purchasing land. He testified that the Court should value land with known deposits on the basis of how market participants value it. We agree that our valuation should mimic the market. *See* Treas. Reg. § 1.170A-1(c)(2). Even if we assumed that a quarry is the highest and best use of the land, petitioner has not established that a quarry operator would have paid more than $750,000 for the land.

Finally, we note that petitioner contests whether the mining-use property comparables that Mr. Brigden identified are sufficiently

---

[43] Petitioner argues that Mr. Brigden misstated the price of one comparable, 571 acres sold in October 2018, by over $87,704. It argues that the comparable occurred in two parts, surface rights for $4.4 million and subsurface rights for $44 million. It argues that Mr. Brigden omitted the $44 million from the price of the comparable. Mr. Brigden credibly testified that the $44 million was a sale of an active quarry operation and that he based the $4.4 million price on property tax records. Accordingly, the $44 million transaction would not support a higher before value even if a quarry was the highest and best use. Moreover, the $44 million sale, $87,704 per acre, would be completely out of sync with other sale prices.

[44] Mr. Gold testified that under general industry practice quarry operators do not conduct feasibility studies to value mineral resources or declare mineral reserves before beginning mining operations. This testimony confirms that aggregate is abundant in the region.

**[\*47]** similar to the easement property.[45] It also argues that it is difficult to value mining-use property using a comparable sales approach. We recognize the difficulties in accounting for physical differences in the land and subsurface materials, the pit size of the quarry, and annual production capacities. Also, the terms of the sales may be confidential and not publicly available. However, we do not rely on Mr. Brigden's analysis of comparable mining-use properties or his before value of the unencumbered property as mining use because a quarry is not its highest and best use. We discuss Mr. Brigden's mining-use comparables analysis because it confirms that New Shoals claimed an exorbitantly high, baseless value for the unencumbered easement property.

### D. *Valuation Decision*

On the basis of the record before us, we find that the before value was $580,000. In reaching our valuation decision, we place the most weight on the $515,000 payout that River Club agreed to for the 103-acre easement property, $5,000 per acre. This payout amount is the largest offer that it received for the property, with the highest previous offer approximately $3,500 per acre. Mr. Brigden's comparable sales analysis confirms our understanding of the value. We also take into account the tax savings that River Club may have hoped to achieve by retaining a small ownership interest in New Shoals.

Both parties' experts used the comparable sales method to determine the after value. Mr. Brigden determined an after value of $100,000, which is more advantageous to New Shoals than the $290,000 after value that petitioner's experts determined. We accept respondent's after value as a concession and find that the after value was $100,000. The easement had a fair market value on the donation date of $480,000.

### IV. *Accuracy-Related Penalties*

Respondent asserts a 40% penalty under section 6662(e) and (h) for a gross valuation misstatement and, alternatively, a section 6662(a) and (b)(3) accuracy-related penalty for a substantial valuation misstatement. A taxpayer makes a gross valuation misstatement when

---

[45] Petitioner objects to Mr. Brigden's other mining-use comparables for numerous reasons, arguing, for example, that they were not mined, were not zoned for mining, were used for storage, were mined for other types of materials such as gravel, fill materials, or dimension stone, or were not sold in arm's-length transactions. We do not need to resolve these issues because we do not rely on Mr. Brigden's mining-use comparable sales analysis.

**[\*48]** it claims a value for donated property that is 200% or more of the amount determined to be the correct value. § 6662(h). Reasonable cause is not available as a defense to the gross valuation misstatement penalty. § 6664(c)(3).

New Shoals claimed a $23 million deduction. The easement had a fair market value on the donation date of $480,000. Because the amount of the claimed deduction was more than 200% of the fair market value, the 40% gross valuation misstatement penalty applies to any underpayment of tax attributable to the valuation misstatement.

In reaching our holdings herein, we have considered all arguments made, and, to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit.

To reflect the foregoing,

*Decision will be entered under Rule 155.*